# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GENERAL CONSTRUCTION COMPANY;
LIBERTY NORTHWEST INSURANCE
CORP.,

         *Petitioners,*

       v.

ROBERT CASTRO; DIRECTOR,
OFFICE OF WORKERS COMPENSATION
PROGRAMS,

         *Respondents.*

No. 03-72528

OWCP No.
14-129-450

BRB No.
02-0783

OPINION

Petition for Review of an Order of the
Benefits Review Board

Argued and Submitted
December 10, 2004—Portland, Oregon

Filed March 2, 2005

Before: Thomas G. Nelson and Johnnie B. Rawlinson,
Circuit Judges, and William W Schwarzer,*
Senior District Judge

Opinion by Judge Schwarzer

---

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

**COUNSEL**

Raymond H. Warns, Jr., Holmes Weddle & Barcott, Seattle, Washington, for the petitioners.

William D. Hochberg and Nicole A. Hanousek, Law Office of William D. Hochberg, Edmonds, Washington, for respondent Robert Castro.

Peter B. Silvain, Jr., Attorney, U.S. Department of Labor, Washington, D.C., for respondent Director, OWCP.

Roger A. Levy, Laughlin, Falbo, Levy & Moresi LLP, San Francisco, California, for amicus curiae Longshore Claims Association.

**OPINION**

SCHWARZER, Senior District Judge:

General Construction Co. and Liberty Northwest Insurance Corp. (General Construction), with amicus Longshore Claims Association (LCA), petition for review of the determination of the Benefits Review Board (BRB) that claimant Robert Castro is entitled to total disability compensation under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950 (1994) (LHWCA), during his period of participation in a vocational rehabilitation program approved by the Office of Workers' Compensation Programs (OWCP). General Construction also claims that the method the administrative law judge (ALJ) used to calculate Castro's average weekly wage was incorrect and that the OWCP violated Gen-

eral Construction's procedural rights under the Administrative Procedure Act (APA) and the Due Process Clause of the federal Constitution.

We deny the petition for review. The BRB appropriately affirmed the ALJ's award under the LHWCA, and the ALJ's wage calculation was correct under Ninth Circuit law. The BRB also correctly concluded that the OWCP's failure to grant General Construction a hearing before approving Castro's rehabilitation program did not violate General Construction's procedural or due process rights.

## STANDARD OF REVIEW

Under the LHWCA, we review BRB decisions "for errors of law and for adherence to the substantial evidence standard." *See Alcala v. Dir., OWCP,* 141 F.3d 942, 944 (9th Cir. 1998). The BRB must accept the ALJ's factual findings if they are supported by substantial evidence. 33 U.S.C. § 921(b)(3); *see also Lockheed Shipbuilding v. Dir., OWCP,* 951 F.2d 1143, 1144 (9th Cir. 1991). "Like the [BRB], this court cannot substitute its views for the ALJ's views." *Container Stevedoring Co. v. Dir., OWCP,* 935 F.2d 1544, 1546 (9th Cir. 1991).

On questions of law, including interpretations of the LHWCA, we exercise de novo review. *Gilliland v. E.J. Bartells Co., Inc.,* 270 F.3d 1259, 1261 (9th Cir. 2001). We need not defer to the BRB's construction of the LHWCA, but we "must . . . respect the [BRB's] interpretation of the statute where such interpretation is reasonable and reflects the policy underlying the statute." *Id.* (quoting *McDonald v. Dir., OWCP,* 897 F.2d 1510, 1512 (9th Cir. 1990)). We also "accord considerable weight to the construction of the statute urged by the Director of the [OWCP] as [s]he is charged with administering" the LHWCA. *Matson Terminals, Inc. v. Berg*, 279 F.3d 694, 696 (9th Cir. 2002) (quoting *Force v. Dir., OWCP*, 938 F.2d 981, 983 (9th Cir. 1991) (internal quotation

marks omitted)). "We will defer to the Director's view unless it constitutes an unreasonable reading of the statute or is contrary to legislative intent." *Id.* (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-45 (1984)).

## BACKGROUND

### I.  CASTRO'S EMPLOYMENT, INJURY, AND REHABILITATION PROGRAM

Claimant Robert Castro worked as a carpenter and pile driver from 1973 until he was disabled due to his injury in 1998. He began work as a pile driver for General Construction in 1998. On November 20, 1998, Castro slipped and fell on a crane step, tearing the anterior cruciate ligament in his right knee. After three surgeries, Castro was released to return to light duty work in August 2000. Castro attempted to return to work at General Construction, but the job he took, cutting metal plates with a torch while seated, was too strenuous, and his physician, Dr. Mandt, determined that it was beyond Castro's ability. No other light duty work being available at General Construction, Mandt recommended vocational retraining.

General Construction conducted labor market studies, which identified jobs the counselors believed Castro could perform, such as courier, cashier, and security officer. The starting wages for these jobs ranged between $8.00 and $10.00 per hour, or between $16,640 and $20,800 per year, but with experience, some could pay up to $25,000 per year. Castro testified that he investigated at least some of these jobs, but found that they were taken. Castro did not investigate other jobs because after commuting costs they would have paid around $2.00 per hour.

OWCP referred Castro to vocational rehabilitation counselor Carol Williams to develop a rehabilitation plan. She and Castro decided on hotel management by a "process of elimination." As part of his vocational rehabilitation plan,

approved by OWCP sometime prior to August 1999 and initiated in August 1999, Castro enrolled in a hotel tourism program at a local college. He was scheduled to take classes from September 13, 2000, through June 7, 2002. Evidence suggested that after completing the program, Castro could expect to earn around $16,000 initially and to progress, with experience, to approximately $27,580 per year, or to as much as $40,000 per year as manager at a larger hotel.[1]

Williams disagreed with General Construction's labor-market survey, claiming that the positions identified would be difficult for Castro because of his physical limitations, which included limits on his manual dexterity due to a previous hand surgery. Williams also took the position that Castro would have "a great deal of difficulty" going to school and working at the same time. Castro spent between forty-six and fifty-four hours per week on his vocational program. His commute to school took anywhere from one and one-half to two and one-quarter hours. He spent fifteen to eighteen hours per week in class and another twenty-five hours per week in study and preparation for class. While in school, Castro worked briefly in a paid internship, but after working about eighty hours he had to resign due to his vocational program's demands and requirements.

When Williams retired at the end of 2000, Castro began to see a new vocational consultant, Stan Owings. Owings concluded that Castro was limited to sedentary jobs or those requiring only light physical exertion, and stated that some of the jobs General Construction identified are "reasonable examples of jobs and wages currently available to" Castro. Owings also recognized that Castro "may return to work with

---

[1]In August 2000, sometime after it learned of Castro's rehabilitation plan, General Construction sent a letter to the OWCP disputing the plan and requesting that the District Director transfer the dispute to an ALJ for a hearing. The record does not indicate that the OWCP responded to or acted on this letter.

or without completing the education curriculum in which he is currently enrolled." As of the dates of the hearing before the ALJ, June 20, 2001, and the ALJ's decision, May 8, 2002, Castro had not completed his schooling.

Castro earned $38,422.57 in 1995, $38,571.33 in 1996, $39,648.34 in 1997, and $39,717.62 in 1998, the year of his injury. General Construction initially paid compensation to Castro based on an average weekly wage of $988.62. On July 3, 2000, however, General Construction reduced this payment to one based on a $500 weekly wage, stating that Castro had not produced requested evidence, including earning statements from prior employment supplementing the $9886.18 he earned at General Construction in the year prior to his injury. On July 11, 2000, General Construction reinstated Castro's compensation based on a recalculated average weekly wage of $756.65. Castro argued that his weekly wage should be $1006.60 and, in support of his motion for partial summary judgment, submitted a declaration stating that during the fifty-two weeks before his accident, he worked a total of 201.35 days. The wage records Castro submitted indicate that in most of the weeks he worked, he worked for forty hours.

## II. CASTRO'S LHWCA CLAIM

Castro filed a claim with the OWCP in November of 1998, seeking permanent partial disability benefits under the LHWCA's schedule for a 35% impairment to his right knee and seeking temporary and permanent total disability benefits for the period he was enrolled in the vocational rehabilitation program.

In May 2002, following a formal hearing, the ALJ issued a decision finding Castro's scheduled disability rating to be 17% and awarding Castro permanent partial disability benefits on the basis of his knee injury for a period of 48.96 weeks (17% of the statutory 288 weeks), pursuant to 33 U.S.C.

§ 908(c)(2), (19).[2] On the issue of Castro's claim for total disability benefits, the ALJ determined that Castro had met his burden of demonstrating inability to return to his usual work (and thus total disability, permitting compensation additional to that for his scheduled injury) but also that General Construction had established the availability of some suitable alternate employment. Nevertheless, the ALJ found that because Castro was enrolled in a vocational rehabilitation program and had shown that completion of the program both precluded employment and gave him the best long-term earning potential, he was entitled to total disability benefits for the duration of the program, under *Louisiana Insurance Guaranty Ass'n v. Abbott*, 40 F.3d 122, 127-28 (5th Cir. 1994).[3]

With respect to the calculation of Castro's award, the ALJ rejected General Construction's assertion that § 10(c) of the LHWCA, 33 U.S.C. § 910(c), should govern, applying instead § 10(a), 33 U.S.C. § 910(a), in accordance with our holding in *Matulic v. Director, OWCP*, 154 F.3d 1052, 1056 (9th Cir. 1998).[4]

General Construction appealed the ALJ's decision to the BRB, which affirmed the award. The BRB, like the ALJ, found *Abbott* to be controlling and noted that since the ALJ had issued the decision in Castro's case the Fourth Circuit had

---

[2]This 2002 hearing on Castro's claim for benefits thus followed OWCP's 1999 approval of Castro's vocational rehabilitation program by several years.

[3]The ALJ acknowledged that *Abbott* does not establish an unqualified entitlement to benefits during vocational rehabilitation but concluded that Castro's situation did not differ from that of the claimant in *Abbott* in any material respects.

[4]Section 10(a) of the LHWCA provides the presumptive method for calculating wages. Section 10(c) is used only when § 10(a) cannot be "reasonably and fairly" applied. 33 U.S.C. §§ 910(a)-(c); *see also Matulic*, 154 F.3d at 1056. Under § 10(a), the ALJ calculated Castro's total disability benefits as $669.58 per week, based on an average weekly wage of $1004.37.

also followed *Abbott*. *Newport News Shipbuilding & Dry Dock Co. v. Dir., OWCP*, 315 F.3d 286, 295 (4th Cir. 2002). The BRB also upheld the ALJ's use of § 10(a) to calculate Castro's average weekly wage, relying, like the ALJ, on *Matulic*. Finally, the BRB rejected General Construction's claim that the OWCP had violated its procedural rights by refusing to afford it a hearing before an ALJ on the question of the appropriateness of vocational rehabilitation in Castro's case. The BRB noted that the Ninth Circuit has held that neither the LHWCA nor any other authority guarantees employers or insurers a hearing before an ALJ on all disputes. *Healy Tibbitts Builders, Inc. v. Cabral*, 201 F.3d 1090, 1093-95 (9th Cir. 2000). ALJs specifically lack jurisdiction to adjudicate disputes over matters committed to the OWCP Director's discretion. *Id.* at 1095. The BRB concluded that the relevant statutory and regulatory provisions committed the design and approval of vocational rehabilitation plans to the discretion of the Director. Since General Construction was not entitled to a hearing before an ALJ on this issue, the OWCP did not violate General Construction's procedural rights when the OWCP declined to order such a hearing.

General Construction timely appealed all three issues: (1) the applicability of *Abbott* to the present case; (2) the applicability of § 10(c) to the present case; and (3) denial of General Construction's procedural rights.

## DISCUSSION

## I.  LEGAL FRAMEWORK

The LHWCA's compensation scheme distinguishes between injury, which is a physical impairment, "occupational disease[,] or infection," 33 U.S.C. § 902(2), and disability, which the LHWCA defines as the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment," *id.* § 902(10). The statutory scheme also provides for four broad

classes of benefits, distinguished according to the duration of the underlying injury (permanent or temporary) and the nature or degree of disability (partial or total). *Id.* § 908; *Stevens v. Dir., OWCP*, 909 F.2d 1256, 1259 (9th Cir. 1990); *Abbott*, 40 F.3d at 125-28.

A disability is temporary "so long as there [is] a possibility or likelihood of improvement through normal and natural healing." *Stevens*, 909 F.2d at 1259 (citation omitted). After a claimant is shown to have attained "maximum medical improvement," however, the remaining disability is classified as permanent. *Id.* at 1258. A disability may be classified as permanent and benefits paid under the LHWCA's provisions for permanent disability for a finite period. *See* 33 U.S.C. §§ 908(a) (providing that permanent total disability benefits pay 66 2/3% of the employee's average weekly wage for the duration of the disability); 908(c), 908(c)(21) (providing that permanent partial disability benefits pay 66 2/3% of the employee's average weekly wage for a length of time determined by schedule or "during the continuance of disability").

A disability is classified as total when (1) a claimant demonstrates that the work-related injury in question renders him unable to return to prior employment, and (2) the employer subsequently fails to establish the availability of suitable alternative employment within the geographic area of the claimant's residence, which the claimant can perform considering the claimant's limitations, age, education, and background, and with a diligent employment search on the claimant's part. *See Bumble Bee Seafoods v. Dir., OWCP*, 629 F.2d 1327, 1329-30 (9th Cir. 1980); *Stevens*, 909 F.2d at 1258.[5] Disabilities not precluding suitable alternative employment are classified as partial. *Stevens*, 909 F.2d at 1258. In other words, in

---

[5]The LHWCA also provides that a disability is classified as total if the underlying injury involves "[l]oss of both hands, or both arms, or both feet, or both legs, or both eyes, or of any two thereof." 33 U.S.C. § 908(a).

general, if the claimant is capable of engaging in some gainful work, the disability is partial. *Id.*

**[1]** Two circuits, the Fifth and the Fourth, have added another element to this basic test for distinguishing between total and partial disability. Under their precedent, a claimant who is enrolled in a vocational rehabilitation program and can demonstrate that the program entirely precludes him from engaging in otherwise suitable employment may receive total disability benefits for the duration of the program. *Abbott*, 40 F.3d at 127; *Newport News*, 315 F.3d at 295. In *Abbott,* an opinion by retired U.S. Supreme Court Justice Byron White, the Fifth Circuit reasoned that although the Act does not explicitly provide for total disability during rehabilitation training, such an interpretation is consistent with "the Act's goal of promoting the rehabilitation of injured employees to enable them to resume their places, to the greatest extent possible, as productive members of the work force." *Abbott*, 40 F.3d at 127 (citation omitted). The validity of this standard in the Ninth Circuit is one of the issues in the present case.

Benefits for total disability, whether temporary or permanent, are calculated on the basis of the claimant's "average weekly wages" and awarded for the "continuance" of the disability. 33 U.S.C. §§ 908(a), (b). Benefits for partial disability, whether temporary or permanent, are awarded according to one of two statutory schemes. *See Potomac Elec. Power Co. v. Dir., OWCP* (*Pepco*), 449 U.S. 268, 270-71 & n.1 (1980); 33 U.S.C. §§ 908(c), 908(c)(21). For particular statutorily enumerated, or "scheduled," injuries, the LHWCA sets forth formulas for calculation of benefits. 33 U.S.C. § 908(c). For injuries that do not fall into any of the scheduled categories, benefits for partial disability are awarded on the basis of the claimant's reduction in earning capacity resulting from the injury. *Id.* § 908(c)(21). These remedies are exclusive; a claimant with a scheduled injury may not elect earning-capacity-based benefits. *Pepco*, 449 U.S. at 273-80. However, under the statutory scheme the distinction between scheduled

and unscheduled injuries is pertinent only to the calculation of permanent *partial* disability benefits; the distinction has no bearing on benefits for *total* disability. *See* 33 U.S.C. § 908(c) (setting forth schedule formulas for calculating "[p]ermanent partial disability"); *see also Brown v. Nat'l Steel & Shipbuilding Co.*, 34 Ben. Rev. Bd. Serv. (MB) 195, 198 (2001); *Gregory v. Norfolk Shipbuilding & Dry Dock Co.*, 32 Ben. Rev. Bd. Serv. (MB) 264, 265-66 (1998).

All of the above calculations require an initial determination of the claimant's "average weekly wage at the time of the injury." *See* 33 U.S.C. § 910. Three different formulas for determination of this amount are set forth at 33 U.S.C. §§ 910(a)-(c). The selection of the proper formula in Castro's case is also at issue in this appeal.

## II. CASTRO'S ENTITLEMENT TO TOTAL DISABILITY DURING VOCATIONAL REHABILITATION

The ALJ in the present case found *Abbott* applicable to Castro's case and held that Castro was entitled to total disability benefits for the period during which he was enrolled in his vocational rehabilitation program. On appeal, General Construction argues (1) that *Abbott* was wrongly decided and should not be applied to this case and (2) that even if *Abbott* was correct on its facts, Castro's case is distinguishable. We address these arguments in turn.

### A. *Abbott Is Consistent with the LHWCA's Text and Purpose*

The interpretation of the LHWCA found in *Abbott* and *Newport News* and adopted by the OWCP Director in this case is supported by the language of the LHWCA and its purpose.

The LHWCA does not specifically provide that total disability benefits are to be awarded where a claimant shows that

participation in a rehabilitation program precludes acceptance of alternative employment. But the statute's silence is not determinative. In fact, the statute is generally silent on the scope and definition of "total disability." *See* 33 U.S.C. § 908(a) (providing that where claimant has not lost two major body parts, the existence of "total disability shall be determined in accordance with the facts"). As the Fifth Circuit noted in *Abbott*, the statute leaves it to the courts to "enunciate standards for distinguishing between the various categories" of disability—total and partial as well as permanent and temporary. 40 F.3d at 125-26.

**[2]** The *Abbott* rule is consistent with the language and a principal policy of the LHWCA: the encouragement of vocational rehabilitation. The LHWCA specifically provides that "[t]he Secretary shall direct the vocational rehabilitation of permanently disabled employees and shall arrange . . . for such rehabilitation." 33 U.S.C. § 939(c)(2). Moreover, the LHWCA defines "disability" as the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment." 33 U.S.C. § 902(10). Thus, the LHWCA speaks of disability in terms of economic harm, not just physical harm. *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 126-27 (1997). The *Abbott* rule, consistently with this definition, simply clarifies that it is possible for a claimant to be entitled to benefits for "total disability" when the claimant is physically capable of performing certain work but unable to secure that work for some other reason. *See Abbott*, 40 F.3d at 127; *see also Newport News*, 315 F.3d at 295.

Amicus LCA argues that *Abbott* was wrongly decided because in 1984 Congress considered and failed to pass amendments to the LHWCA creating a statutory entitlement to total disability for all claimants during vocational rehabilitation training. We note at the outset that congressional inaction is not a reliable guide to legislative intent. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511

U.S. 164, 187 (1994) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.") (internal quotations and citations omitted); *United States v. Wise*, 370 U.S. 405, 411 (1962). Moreover, the failed amendments in this case would have been more sweeping than *Abbott*'s rule, since they would have created an entitlement to disability benefits during rehabilitation. H.R. 7610, 96th Cong., 2d Sess. at 19-20 (1980) (providing that "[a]n employee who as a result of injury is undergoing vocational rehabilitation . . . shall be entitled to receive continued temporary total or partial compensation during . . . such rehabilitation").[6] In contrast, the *Abbott* rule requires a fact-finder to consider on a case-by-case basis an injured worker's participation in a rehabilitation program as one factor in determining whether suitable alternative employment is available to that worker. *Cf. Kee v. Newport News Shipbuilding & Dry Dock Co.*, 33 Ben. Rev. Bd. Serv. (MB) 221 (2000) (applying *Abbott* and denying temporary total disability benefits when claimant failed to show that enrollment in rehabilitation program precluded acceptance of alternate employment); *Gregory*, 32 Ben. Rev. Bd. Serv. (MB) 264 (same). Congress's failure to enact an amendment more sweeping than the *Abbott* rule cannot be taken to invalidate that rule. The text, purposes, and legislative history of the LHWCA thus provide no basis for rejecting the *Abbott* approach.[7]

---

[6]*See also* H.R. Rep. No. 98-570, pt. I, at 83 (1983) (including comments from sponsor of H.R. 7610 (1980) noting that compromises on LHWCA amendments included the elimination of "amendments concerning vocational rehabilitation which assured continued payment of benefits during rehabilitation").

[7]General Construction and LCA also invoke the language of § 8(g) of the LHWCA in support of the contention that the only money Congress intended to be provided to claimants during vocational rehabilitation is a $25 maintenance stipend. 33 U.S.C. §§ 908(g), 944. This argument ignores the plain language of the statute. Section 8(g) states that an injured

*B.   Abbott Applies to the Present Case*

General Construction further argues that even if *Abbott* is a valid interpretation of the LHWCA, it is inapplicable here because Castro's situation differs significantly from that of the claimant in *Abbott*. Specifically, (1) Castro's program did not involve an agreement with the OWCP that expressly forbade his employment during the program; (2) General Construction itself never agreed to the rehabilitation plan; (3) the evidence showed Castro could work while enrolled in his rehabilitation program; (4) Castro was not diligent in attempting to locate work while pursuing the program; (5) completion of the program would not increase Castro's earning capacity; and (6) Castro, unlike the claimant in *Abbott*, suffered scheduled injuries, and *Pepco* therefore limits Castro to recovery under the LHWCA's schedule.

**[3]** We agree with the Fourth Circuit in *Newport News* that *Abbott* did not set forth a rigid rule and that a number of factors enumerated by the BRB may be relevant to determining whether an individual may receive benefits while enrolled in a rehabilitation program. These include whether enrollment in the rehabilitation program precludes any employment; whether the employer agreed to the rehabilitation plan and continuing payment of temporary total disability benefits; whether completion of the program would benefit the claimant by increasing his wage-earning capacity; and whether the claimant showed full diligence in completing the program. *Newport News*, 315 F.3d at 293 (citing *Gregory*, 32 Ben. Rev. Bd. Serv. 264). The Fourth Circuit observed that no one of

---

worker in vocational rehabilitation who is being rendered fit for remunerative occupation "shall receive *additional* compensation necessary for his maintenance, but such *additional* compensation shall not exceed $25 a week." 33 U.S.C. § 908(g) (emphasis added). This language indicates Congress's intent that the fee be paid in addition to—not in place of—other appropriate compensation.

these factors, standing alone, should necessarily be considered determinative. 315 F.3d at 295-96.

**[4]** With respect to General Construction's first argument, the ALJ noted that the BRB has interpreted *Abbott* to require only that a claimant show that, as a practical matter, he cannot obtain suitable alternative employment, not that he is contractually precluded from working. *See Kee*, 33 Ben. Rev. Bd. Serv. at 223. This approach makes sense given the language and purposes of the LHWCA, which provides for compensation for a claimant's reduced earning capacity under a variety of circumstances. *See, e.g.*, 33 U.S.C. §§ 902(10) (defining "disability"), 908(a) (providing for determination of permanent total disability "in accordance with the facts"). A claimant's earning capacity suffers as a result of his inability to engage in alternative employment, regardless of the cause of that inability. We agree with the ALJ that neither *Abbott* nor the LHWCA should be read to require that the inability have a contractual basis.

With respect to General Construction's second argument, the ALJ noted that General Construction objected to the rehabilitation plan and to continued benefits. But the ALJ also reasoned that allowing employers an effective veto power over OWCP-approved rehabilitation programs would undermine the LHWCA's general policy of encouraging rehabilitation. We agree. There was no error in the ALJ's decision that General Construction's objection to the rehabilitation program does not sufficiently distinguish Castro's case from *Abbott*.

With respect to General Construction's third argument, regarding evidence of Castro's ability to work while pursuing his rehabilitation program, the ALJ evaluated relevant evidence, including the testimony of Castro and vocational experts Carol Williams and Kent Shafer. The ALJ based his decision that Castro could not work while pursuing his program mainly on Castro's uncontradicted testimony that, including commuting, class, and study time, he devoted

between forty-six and fifty-four hours per week to completion of the program.[8] General Construction notes that Castro worked briefly in a paid internship. But Castro had to resign this internship after eighty hours of work because of the demands of his rehabilitation program. The ALJ found this to be evidence that Castro was willing but unable to work, despite testimony to the contrary by General Construction's expert. The ALJ's factual finding is supported by substantial evidence. 33 U.S.C. § 921(b)(3); *Container Stevedoring Co.,* 935 F.2d at 1546.

The ALJ similarly considered General Construction's fourth argument, that Castro failed to show he searched diligently for work while pursuing his rehabilitation program. This argument is largely foreclosed by the ALJ's determination that the time demands of Castro's program precluded his employment during the program. Castro also presented evidence that he investigated jobs identified by General Construction but found them either unavailable or impracticable because of his commute. The ALJ's finding is thus supported by substantial evidence.

The ALJ also found that Castro was diligent in completing his program. *See Newport News*, 315 F.3d at 293 (citing *Gregory*, 32 Ben. Rev. Bd. Serv. 264). The ALJ found that, although Castro expressed concerns about falling behind in school, his records indicated that his enrollment since 1999 had not been significantly interrupted and that at the time of the hearing he was on schedule to complete his program. The ALJ's finding that Castro had pursued his degree in the program diligently is supported by substantial evidence.

The ALJ also considered General Construction's fifth argu-

---

[8] Williams stated that Castro's intellectual capacity and long commute would make combining school with a job difficult, while Shafer noted that travel requirements combined with cognitive capacity could prevent some people from working while in school.

ment, that *Abbott* should not apply because Castro's rehabilitation program was not designed to improve his earning capacity. The ALJ noted that, although hotel management starting salaries were comparable to the salaries in the jobs General Construction had identified, Castro's vocational advisors reasonably determined that training in hotel management would give Castro the best long-term earning potential.[9] The ALJ was correct to focus on Castro's long-term wage-earning prospects in assessing the rehabilitation program, *see Newport News*, 315 F.3d at 295-95 ("an immediate increase in wage earning capacity . . . is not . . . determinative"); *Abbott*, 40 F.3d at 128 (looking to employee's long-term increase in wage-earning capacity in assessing reasonableness of vocational rehabilitation program), and his factual determination that Castro's rehabilitation program provided the best long-term wage-earning prospects is supported by substantial evidence.

[5] Neither the ALJ nor the BRB considered at length General Construction's argument concerning the application of *Pepco*, 449 U.S. 268 (1980), to Castro's case. However, the ALJ's interpretation of the scope of *Pepco* correctly precluded application of that case to Castro's claim for total disability benefits during his rehabilitation program. In *Pepco*, the Supreme Court held that where a claimant is entitled to partial disability benefits for a scheduled injury, those benefits are the claimant's exclusive remedy; a claimant with a scheduled injury may not elect to recover benefits for partial disability on the basis of the claimant's loss in earning capacity. *Id.* at 273-74. General Construction argues that if a claimant has a scheduled injury, and the employer shows that the claimant is employable, the claimant cannot also be entitled to an award of total disability benefits during a rehabilitation program; the argument implies that allowing recovery for the time spent in

---

[9]Williams estimated that Castro could earn between $30,000 and $40,000 annually as a hotel manager, as compared to the $16,640 to $25,000 potential of the jobs identified by General Construction.

the rehabilitation program is analogous to allowing recovery for a loss in earning capacity. The argument fails because, as the ALJ correctly noted, *Pepco* addresses only the statutory provisions for partial disability benefits. *See id.* at 274 & n.8; see also *Brown*, 34 Ben. Rev. Bd. Serv. at 198 (finding scheduled nature of claimant's injury irrelevant to appropriateness of rehabilitation program and award of benefits for that period); *Gregory*, 32 Ben. Rev. Bd. Serv. at 265-66 (noting that "where claimant is totally disabled the schedule does not apply" and that "the fact that any permanent partial disability would be covered by the schedule is not determinative of the total disability issue"). Since *Pepco* does not address computations of awards for temporary total disability, which is the focus of the *Abbott* rule, we agree with the ALJ and the BRB that the scheduled or unscheduled nature of a claimant's injury is irrelevant.

[6] We conclude that the ALJ and BRB did not err in finding that Castro's case did not differ materially from *Abbott* and *Newport News* so as to preclude application of the *Abbott* rule. We therefore affirm the award of permanent total disability benefits to Castro during his participation in his OWCP-approved rehabilitation program.

## III. CALCULATION OF AVERAGE WEEKLY WAGE

[7] General Construction contends that the ALJ erred in calculating Castro's average weekly wage under § 10(a) of the Act, 33 U.S.C. § 910(a). Although § 10(a) is presumed to apply absent a showing that its application would be unreasonable, and although the ALJ properly applied this provision under Ninth Circuit precedent, *Matulic*, 154 F.3d 1052 (9th Cir. 1998), General Construction argues that we should overrule that precedent or at least distinguish it.

The relevant subsections of § 10 of the Act state:

Except as otherwise provided in this chapter, the average weekly wage of the injured employee at the

time of the injury shall be taken as the basis upon which to compute compensation and shall be determined as follows:

(a)   If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding the injury, his average annual earnings shall consist of . . . two hundred and sixty times the average daily wage or salary for a five-day worker . . . .

(c) If . . . the foregoing methods of arriving at the average annual wage of the injured employee cannot reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality. . . .

33 U.S.C. § 910(a), (c) (2000).

**[8]** Section 10(a) plainly applies if the employee "worked in the employment . . . whether for the same or another employer, during substantially the whole of the year immediately preceding the injury." 33 U.S.C. § 910(a). In *Matulic*, we addressed the meaning and scope of the language "substantially the whole of the year immediately preceding [the] injury." 154 F.3d at 1056. Noting that "some 'overcompensation' is built into the [LHWCA] system institutionally," we concluded that the LHWCA's language did not require a claimant to have worked 100% of the potential working days during the year immediately preceding the injury in order for § 10(a) to apply "reasonably and fairly." *Id.* at 1057. Specifi-

cally, we held that § 10(a) presumptively applies "when a claimant works more than 75% of the workdays of the measuring year."[10] *Id.* at 1058. It may even apply when the claimant has worked less than 75% of these days, if the reduction in working days is "atypical of the worker's actual earning capacity." *Id.*[11] In *Matulic*, the claimant worked 213 days in the relevant year, or 82% of the statutory 260 days. *Id.* at 1058. We recently approved application of *Matulic* and § 10(a) where a claimant worked 197 days, or 75.77% of the statutory total. *Stevedoring Servs. of Am. v. Price*, 382 F.3d 878, 884-85 (9th Cir. 2004).

General Construction argues that (1) *Matulic* is contrary to the language of the LHWCA and should be overruled and that (2) even if *Matulic* is good law, it does not apply to Castro's case. We consider each of these arguments in turn.

### A. Matulic Is Good Law

General Construction's primary arguments for overruling *Matulic* are as follows: (1) *Matulic* permits and promotes overcompensation of claimants, a result contrary to the plain language of the LHWCA; (2) the 75% bright line drawn in *Matulic* creates absurd results; (3) *Matulic* is inconsistent with the law in other circuits and with the reasoning in relevant Supreme Court precedent.

---

[10]We based this conclusion in part on our observation in an earlier case that "the point at which the disparity between the claimant's actual days worked and the [potential days worked] becomes unreasonable or unfair[, triggering application of § 10(c),] is 'a question of line-drawing.' " *Matulic*, 154 F.3d at 1057-58 (quoting *Duncanson-Harrelson Co. v. Dir., OWCP*, 686 F.2d 1336, 1343 (9th Cir. 1982)). We determined in *Matulic* that the 75% threshold was an appropriate place to draw this line. 154 F.3d at 1057-58.

[11]We further noted that § 10(c) "may not be invoked in cases in which the only significant evidence that the application of [§ 10(a)] would be unfair or unreasonable is that claimant worked more than 75% of the days in the year preceding his injury." *Matulic*, 154 F.3d at 1058-59.

To begin, we note that "[w]e are bound by decisions of prior panels unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions." *Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 983 (9th Cir. 2002) (citation omitted). Because none of these conditions applies, we reject General Construction's arguments. Even if we had the capacity to overrule *Matulic*, however, we would reach the same conclusion.

[9] In *Matulic* itself, we addressed concerns about whether potential overcompensation was consistent with the purposes of the LHWCA. 154 F.3d at 1057. We noted that no one in the country works every working day of every work week and that Congress must have known that some overcompensation would result from the standard work year of 260 days provided for in the LHWCA. *Id.* We reasoned that any inaccuracies in estimating wage-earning capacity should normally favor the worker, given the "humanitarian purposes" of the Act and our mandate to construe its provisions broadly in favor of workers. *Id.*[12] General Construction rests virtually its entire argument that the LHWCA reflects a policy against overcompensation on the existence of § 10(c), which acknowledges the possibility that weekly wage calculations may be unfair or unreasonable in some circumstances. Given the virtual inevitability of overcompensation under § 10(a), we decline to interpret the existence of § 10(c) as a statutory bar to any application of the LHWCA resulting in arguable overcompensation.

General Construction's absurdity argument rests on the contention that a worker who has worked 75% of the statutory

---

[12]It should also be noted that whether "overcompensation" occurs at all under *Matulic* is questionable. The LHWCA does not compensate for, among other things, lost pay increases or the lost value of fringe benefits. These gaps in compensation may be partly responsible for Congress's decision to provide for calculation methods that would tend to overcompensate for time worked rather than to undercompensate.

days will have worked an average of 3.75 days per week, but under § 10(a) will receive the same compensation as a worker who worked 5 days per week. This argument would appear to attack not only the line drawn in *Matulic* but also the drawing of a line at all. General Construction does not explain when such a disparity would not rise to the level of absurdity; if any disparity between actual hours worked and compensation is an absurd result, as General Construction's argument implies, then no claimant who worked less than 100% of the statutory 260 days would be entitled to application of § 10(a). Yet the plain language of § 10(a) itself does not require this. Rather, the subdivision applies to claimants who have worked "*substantially* the whole of the year immediately preceding his injury." 33 U.S.C. § 910(a) (emphasis added). "Substantially" would be meaningless if we were to follow General Construction's suggested interpretation of § 10(a), and as a result we decline to do so.

General Construction also argues that *Matulic* is inconsistent with the law in other circuits and with Supreme Court precedent. The only circuit opinion cited reaching a result contrary to *Matulic* is *Strand v. Hansen Seaway Service, Inc.*, 614 F.2d 572 (7th Cir. 1980). But we acknowledged and rejected *Strand* in *Matulic* itself, noting "[w]e do not believe such a rigid rule [requiring use of § 10(c) where claimant had worked 84% of the days in the statutory year] is consistent with the intent or purpose of the [LHWCA]." *Matulic*, 154 F.2d at 1058 n.4. General Construction offers no compelling reason for us to revisit this conclusion.

General Construction also cites the Supreme Court's opinion in *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994).[13] But the limited, technical holding in *Greenwich Col-*

---

[13]This opinion predates our decision in *Matulic*, so that General Construction's reliance on it amounts, again, to a contention that *Matulic* was wrongly decided—not to an argument that intervening Supreme Court precedent requires us to reject *Matulic*'s rule.

*lieries*[14] is irrelevant to the soundness of our decision in *Matulic* to interpret § 10(a) broadly in light of the remedial purposes of the LHWCA. *See* 154 F.3d at 1055, 1057. Even were we empowered to overrule *Matulic*, General Construction has presented no convincing reason for us to do so.

### B.    *Matulic Applies to the Present Case*

General Construction argues that even if we do not overrule *Matulic*, we should not apply it to the present case because the decision of the ALJ and BRB that § 10(a) could "reasonably and fairly" be applied was not supported by substantial evidence. 33 U.S.C. § 910(c). General Construction maintains that use of § 10(a) to compute Castro's award amounts to an unfair and unreasonable windfall.

This approach has been foreclosed by *Matulic* itself, which established as a matter of law that application of § 10(a) to a claimant who had worked 75% or more of the statutory 260 days is not unfair or unreasonable. 154 F.3d at 1058-59. During the year preceding his injury, Castro worked 201.35 days out of 260, approximately 77.4% of the year. His case fits precisely within the rule established in *Matulic*. The fact that he worked fewer days than did the claimant in *Matulic* is not,

---

[14]In *Greenwich Collieries*, the Supreme Court rejected an evidentiary rule devised by the Department of Labor for use in benefits claims cases where an ALJ found the evidence on a disputed question to be in equipoise. 512 U.S. at 269. Under this "true doubt" rule, the ALJ was to resolve such questions in the claimant's favor. *Id.* The Supreme Court rejected this rule as contrary to the language of the governing statutes. *Id.* at 280-81. But the Court also implicitly distinguished the true doubt rule from other procedural and interpretive techniques favoring claimants under remedial statutes such as the LHWCA. *See id.* at 280 ("In part due to Congress' recognition that claims such as those involved here would be difficult to prove, claimants . . . benefit from certain statutory presumptions easing their burden. Similarly, the Department's solicitude for benefits claimants is reflected in the regulations adopting additional presumptions. But with the true doubt rule the Department attempts to go one step further.") (internal quotation marks and citations omitted).

under the reasoning in that decision, a basis for distinguishing the case or refusing to apply its rule.[15] *Id.*

**[10]** General Construction also argues that, unlike the claimant in *Matulic*, Castro never earned a weekly wage comparable to the result of the § 10(a) calculation in his case. It notes that the difference between the annual wage resulting from a § 10(a) calculation and Castro's actual earnings in the previous year is approximately $12,000. This is not significantly different from the situation in *Matulic* itself, in which under § 10(a) the claimant received a wage increase of approximately $10,000. 154 F.3d at 1056. It is true that we found the previous year's earnings of the claimant in *Matulic* to have been anomalously low. *Id.* at 1058. However, that finding was not the basis for our articulation of the bright-line 75% rule. *Id.* at 1058-59. We based our holding in *Matulic* on an examination of the purposes of the LHWCA, not the fairness of the result in the particular case. *See id.* at 1057-59. The factual distinction noted by General Construction is therefore irrelevant to whether or not *Matulic* applies to the present case. The ALJ and BRB accordingly did not err in applying *Matulic* and approving calculation of Castro's average weekly wage under § 10(a).

## IV.   GENERAL CONSTRUCTION'S PROCEDURAL RIGHTS

General Construction argues that it demanded, but was improperly denied, a hearing before an ALJ to determine the necessity of a vocational rehabilitation program for Castro before that plan was implemented. According to General Construction, the LHWCA provides it with the right to an ALJ hearing upon request. 33 U.S.C. § 919(c), (d). General Construction also contends that the OWCP violated its Fifth

---

[15]We even noted in *Matulic* that it might be neither unfair nor unreasonable to apply § 10(a) in a case involving a claimant who had worked less than 75% of 260 days. 154 F.3d at 1058.

Amendment due process rights when the OWCP imposed compensation liability on General Construction for the duration of a rehabilitation plan into which it had no input.[16] We address these arguments in turn.

### A.    The OWCP Did Not Violate General Construction's Statutory Procedural Rights

The LHWCA provisions General Construction cites state only that "the deputy commissioner shall make or cause to be made such investigations as he considers necessary in respect of the claim, and upon application of any interested party shall order a hearing thereon," 33 U.S.C. § 919(c), and that such hearings will be governed by the APA. *Id.* § 919(d).

**[11]** We recently described the scope of § 919(c) in *Healy Tibbitts*, 201 F.3d at 1094. We held that "section 919(c) does not necessarily require an evidentiary hearing before an ALJ on all contested issues." *Healy Tibbitts*, 201 F.3d at 1093. We held that ALJs in fact lack jurisdiction over certain disputes, in particular those involving "strictly legal issues," *id.* at 1095, and matters within the discretion of a District Director turning on assessments of "reasonableness" and not involving factual questions resolvable by an ALJ, *id.* at 1097. Thus, the existence of a dispute does not in itself trigger a right to a hearing under the LHWCA.

---

[16]General Construction also argues more broadly that the rule in *Abbott* is "unconstitutional" because it deprives employers of due process. But an employer may receive a hearing if it controverts or contests an injured employee's claim for benefits. *See* 33 U.S.C. §§ 914(d), (h). And if an ALJ determines that an employer paid a claimant more in benefits than required by law, the ALJ may order deduction of the overpayment from future payments to the claimant. *See, e.g.*, *Bush v. I.T.O. Corp.*, 32 Ben. Rev. Bd. Serv. (MB) 213, 215 n.5 (1998) (noting ALJ's order that overpayment be recovered by deductions from claimant's continuing benefit payments). Given these safeguards, *Abbott* puts employers at no risk of suffering any kind of permanent wrongful deprivation.

**[12]** The dispute in the present case concerned the initial reasonableness of the vocational rehabilitation plan undertaken by Castro and approved by the OWCP. This determination, while not entirely a legal issue, *Healy Tibbitts*, 201 F.3d at 1095, turned on a "reasonableness" decision and did not require any factual determinations of disputed issues by an ALJ, *id.* at 1097. Moreover, the LHWCA and its accompanying regulations commit the direction and therefore also the approval of such rehabilitation programs to the discretion of the Director. *See* 33 U.S.C. § 939(c)(2) ("The Secretary shall direct the vocational rehabilitation of permanently disabled employees."); 20 C.F.R. §§ 701.202 (delegating to OWCP Director authority for administering LHWCA), 701.301(a)(6), (7) (delegating to District Director administrative approval authorities of OWCP Director), 702.506 (providing that "[t]he vocational rehabilitation advisor shall arrange for and develop all vocational training programs"). Under *Healy Tibbitts*, the LHWCA did not entitle General Construction to an ALJ hearing on the reasonableness of Castro's rehabilitation plan prior to the implementation of that plan.

**[13]** General Construction also argues that the failure to afford it a hearing violated the APA. But § 919(d) merely requires that any hearings ordered by the Director be conducted in accordance with the APA. 33 U.S.C. § 919(d); *see also Healy Tibbitts*, 201 F.3d at 1094. If no hearing is required, no question as to whether the APA has been violated can arise. We conclude that the OWCP's failure to order an ALJ hearing regarding Castro's rehabilitation program prior to approval of the program did not violate the provisions of the LHWCA.

### B.  *The OWCP Did Not Violate General Construction's Constitutional Due Process Rights*

General Construction claims it was entitled to a hearing before an ALJ prior to implementation of the vocational rehabilitation program, which deprived it of property by requiring

payment of benefits to Castro, in violation of the Due Process Clause of the Fifth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).**[17]**

**[14]** The flaw in General Construction's argument is that the OWCP's implementation of Castro's rehabilitation plan did not, in itself, deprive General Construction of its property, since that implementation did not automatically trigger payment of permanent benefits to Castro. When the issue of disability compensation arose with Castro's filing of a claim for benefits, the District Director properly forwarded the matter to the Office of Administrative Law Judges for further handling, and an ALJ held a full hearing on the merits of Castro's claim for benefits. General Construction received notice and an opportunity to submit evidence and argument before the ALJ's decision awarding compensation and before it was required to pay anything. This constituted a sufficient predeprivation hearing. *See Mathews*, 424 U.S. at 333 (1976) (requiring the opportunity to be heard "at a meaningful time and in a meaningful manner") (internal quotation marks and citations omitted); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (requiring that a party have the opportunity for "some kind of a hearing" before being deprived of a significant property interest) (citation omitted). We conclude, therefore, that the OWCP's handling of Castro's claim for benefits did not deprive General Construction of its due process rights under the federal Constitution.

---

**[17]**Specifically, General Construction argues that it "had a direct financial stake in whether the vocational plan concocted by the consultant hired by the Department of Labor went forward because, under *Abbott*, it was going to be liable for total disability compensation under that program." As noted, any liability for compensation on General Construction's part under *Abbott* did not arise until Castro had (1) filed a claim for benefits and (2) at a hearing, carried his burden of showing that his rehabilitation program precluded his employment. *See Kee*, 333 Ben. Rev. Bd. Serv. at 223 (holding that claimant has burden of showing that "suitable alternative jobs were realistically unavailable while he was in the [rehabilitation] program").

**CONCLUSION**

For the above-stated reasons, we DENY the petition for review.

**DENIED.**