**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SSA TERMINALS AND HOMEPORT INSURANCE COMPANY,<br>     *Petitioners*,<br><br>v.<br><br>ROBERT CARRION; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAM,<br>     *Respondents.* | No. 13-72929<br><br>BRB No.<br>12-0601 |
| ROBERT CARRION,<br>     *Petitioner*,<br><br>v.<br><br>SSA MARINE TERMINALS, LLC; HOMEPORT INSURANCE COMPANY; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAM,<br>     *Respondents.* | No. 13-72948<br><br>BRB No.<br>12-0601<br><br>OPINION |

On Petition for Review of an Order of the
Benefits Review Board

Argued and Submitted
November 17, 2015—San Francisco, California

Filed May 11, 2016

Before: M. Margaret McKeown, Johnnie B. Rawlinson,
and Andre M. Davis,[*] Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[**]

**Longshore and Harbor Workers' Compensation Act**

The panel denied an employer/insurer's petition for review, and granted a claimant's cross-petition for review of a decision by the Benefits Review Board, in an action brought by a claimant seeking disability benefits under the Longshore and Harbor Workers' Compensation Act.

The administrative law judge ("ALJ") determined that claimant's claim was timely filed under the Longshore Act, and determined that the disability was temporary because the claimant was contemplating knee replacement surgery that would likely alleviate his symptoms. The Benefits Review Board affirmed.

---

[*] The Honorable Andre M. Davis, Senior Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held the claimant timely filed his claim against his employer.  In determining whether the one-year statute of limitations on disability claims was met, pursuant to 33 U.S.C. § 913(a), the panel held that the ALJ and the Benefits Review Board correctly looked to the date when the claimant became aware that his work for the employer caused a second, cumulative traumatic injury resulting in an impairment of his earning power.

The panel held that claimant's knee injury was a permanent, rather than a temporary, disability.  The panel held that evaluating an individual's condition based on the presumed effect of a theoretical future treatment was error.  The panel held that the appropriate question is not whether a future surgery would ameliorate claimant's knee condition, but whether there was actual or expected improvement to his knee after a normal and natural healing period.

Finally, the panel held that the doctrines of exhaustion and waiver were inapplicable because claimant presented his claim of permanent disability well before the conclusion of the administrative process and neither the employer nor the agency was blindsided by the argument.

**COUNSEL**

Gursimmar Sibia (argued) and Judith Leichtnam, Bruyneel & Leichtnam, San Francisco, California, for Petitioners/Cross-Respondents.

Joshua T. Gillelan, II (argued), Longshore Claimants' National Law Center, Washington, D.C.; Eric A. Dupree, Dupree Law, Coronado, California, for Respondent/Cross-Petitioner.

Matthew W. Boyle (argued), Attorney, M. Patricia Smith, Solicitor of Labor, Rae Ellen James, Associate Solicitor, Mark A. Reinhalter, Counsel for Longshore, Gary K. Stearman, Appellate Counsel, United States Department of Labor, Washington, D.C., for Federal Respondent.

**OPINION**

McKEOWN, Circuit Judge:

In 1987, Robert Carrion sustained a severe knee injury while working as a chassis mechanic. Although Carrion returned to his physically demanding job and worked for the next fifteen years, his knee continued to deteriorate. He took early retirement in 2002, when his pain became so great that he could walk only with difficulty. After Carrion's former employer ceased paying for treatment, he filed for disability under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Longshore Act"), 33 U.S.C. § 901 *et seq.*

By the time he filed his claims in 2008, Carrion had endured decades of persistent pain without any actual or

expected improvement. Without doubt, he was disabled, and his doctors unanimously concluded that he eventually would require total knee replacement surgery. Even though no surgery was on the horizon, his employer classified the injury as a temporary disability. The question we address is whether, after such a protracted period of disability, the prospect of a hypothetical future surgery and its anticipated benefits can transform an otherwise permanent disability into a temporary one for purposes of the Longshore Act. We hold that it cannot.

## BACKGROUND

Carrion tore his right medial meniscus and right anterior cruciate ligament in January 1987 while working for Matson Terminals, Inc. ("Matson"). Although Carrion returned to work, his knee continued to deteriorate and he has endured persistent pain ever since. After Carrion's injury, SSA Marine Terminals ("SSA") took over Matson. Carrion became an SSA employee, but Matson continued paying for his knee treatments. Carrion took early retirement in 2002. At that point, the medial joint space in his knee was "completely gone." His treating physician, Dr. Caldwell, advised him that he would eventually require a total knee replacement, but recommended that Carrion forgo the surgery until his symptoms worsened.

Four years later, Matson stopped authorizing payments for Carrion's knee treatments. In the spring of 2008, Carrion filed claims against both Matson and SSA seeking benefits under the LHWCA. He listed the date of his cumulative knee injury as February 28, 2002—his retirement date.

Dr. Stark, an expert hired by Matson, examined Carrion in September of 2008.  Like Dr. Caldwell, Dr. Stark concluded that Carrion required total knee replacement surgery.  Dr. Stark also diagnosed Carrion's knee condition as the result of both a "natural progression of [his] degenerative arthritis and also [the] cumulative trauma" he experienced in his physically demanding work.  One year later, SSA hired Dr. von Rogov, who similarly concluded, after examination, that Carrion would need total knee replacement surgery.  In Dr. von Rogov's view, Carrion's condition was solely the result of the "natural progression of the January [8], 1987 injury," since he would have required a total knee replacement after that trauma even if he had only undertaken sedentary activities since that time.  At the time of the administrative hearing in 2009, Carrion was in pain "all day and all night," but had not yet received a knee replacement.

The Administrative Law Judge ("ALJ") determined that Carrion did not learn of the causal connection between his work for SSA and his cumulative trauma injury until he received Dr. Stark's 2008 report.  Carrion thus filed his claim against SSA within the one-year statute of limitations governing claims under the LHWCA.  Noting that "[a]t first blush, it seems [Carrion's] injury is permanent," and acknowledging that Carrion's "condition has lasted for a long period of time," the ALJ nevertheless concluded that Carrion's disability was temporary.  The ALJ reasoned that Carrion was contemplating knee replacement surgery, which his doctors agreed would likely alleviate his symptoms, and thus "medical improvement through the knee replacement was available" once "his pain became too much."  The ALJ noted, however, that if Carrion decided against surgery and

opted to "live with the knee pain indefinitely, he would be found permanently disabled."

SSA appealed the ALJ's timeliness determination to the Benefits Review Board ("BRB" or "the Board"), and Carrion cross-appealed the ALJ's finding that his disability was temporary. The BRB affirmed the ALJ on both issues. We review the Board's decisions "for errors of law and for adherence to the substantial evidence standard. . . . On questions of law, including interpretations of the LHWCA, we exercise de novo review." *Gen. Constr. Co. v. Castro*, 401 F.3d 963, 965 (9th Cir. 2005) (internal quotations and citations omitted).

## ANALYSIS

The threshold inquiry is whether Carrion timely filed his claim. The Longshore Act imposes a one-year statute of limitations on disability claims, which begins to run once the employee is, or should be, aware "of the relationship between the injury . . . and the employment." 33 U.S.C. § 913(a). We have explained that § 913(a) contemplates an impairment of earning power, and thus an employee only becomes aware of an injury for statutory purposes when he becomes "aware of the full character, extent, and impact of the harm done to him." *Todd Shipyards Corp. v. Allan*, 666 F.2d 399, 401–02 (9th Cir. 1982) (quotations omitted).

Both the ALJ and the BRB correctly applied this standard by looking to the date when Carrion became aware that his work for SSA caused a second, cumulative traumatic injury resulting in an impairment of his earning power. Substantial evidence supports the conclusion that Carrion did not "become aware of the full character, extent, and impact of the

harm done to him" until he received Dr. Stark's report, several months after Carrion filed his claim against SSA.

Before seeing Dr. Stark's evaluation, Carrion had no understanding of the medical principle of cumulative trauma. Carrion's treating physician, Dr. Caldwell, testified that he never explained the concept of cumulative trauma to Carrion, and as the ALJ noted, a layperson would not understand that "the incremental erosion or worsening of a knee condition can be the basis for a cumulative trauma claim." Even after Carrion became an SSA employee in 1999, Matson continued paying for Carrion's knee treatments, thus reinforcing Carrion's reasonable belief that his disability was solely the result of the trauma he sustained in 1987. Indeed, SSA's own expert, Dr. von Rogov, initially concluded that Carrion's disability was solely attributable to the 1987 injury. Although Carrion experienced ongoing pain and required ongoing medical treatment, those circumstances alone are insufficient to establish knowledge of a cumulative trauma. *See, e.g.*, *Abel v. Dir., Office of Workers' Comp. Programs*, 932 F.2d 819, 823 (9th Cir. 1991) (claimant's recurring pain and persistent symptoms insufficient to establish awareness of injury for purposes of § 913(a)); *J.M. Martinac Shipbuilding v. Dir., Office of Workers' Comp. Programs (Grage)*, 900 F.2d 180, 184 (9th Cir. 1990) (claimant's pain and other symptoms did not establish awareness of a compensable injury). We thus affirm the BRB's decision upholding the ALJ's conclusion that Carrion timely filed his claim against SSA.

With this issue resolved, we turn to the crux of this appeal: whether Carrion's knee injury was a temporary or permanent disability. The Longshore Act creates "two independent areas of analysis," one assessing the nature, or

duration, (temporary versus permanent) and the other the degree of the disability (partial versus total). *Pac. Ship Repair & Fabrication, Inc. v. Dir., Office of Workers' Comp. Programs (Benge)*, 687 F.3d 1182, 1185 (9th Cir. 2012) (quoting *Stevens v. Dir., Office of Workers' Comp. Programs*, 909 F.2d 1256, 1259 (9th Cir. 1990)).   Four separate disability categories stem from this framework: permanent total disability; temporary total disability; permanent partial disability; and temporary partial disability.   33 U.S.C. § 908(a)–(c), (e).  Two of these qualifiers, permanent and temporary, "go to the nature of the disability." *Benge*, 687 F.3d at 1185 (quoting *Stevens*, 909 F.2d at 1259).  Only the nature of Carrion's disability is at issue here.

Curiously, the Longshore Act does not define "temporary" or "permanent,"  although the classification issue arises on a continuing basis.  We have held that "[a] disability is temporary 'so long as there [is] a possibility or likelihood of improvement through normal and natural healing.'"   *Castro*, 401 F.3d at 968 (quoting *Stevens*, 909 F.2d at 1259) (second alteration in original).  A disability may become permanent if (1) a claimant reaches "maximum medical improvement"—the point at which "the injury has healed to the full extent possible" and normal and natural healing is no longer likely, *Stevens*, 909 F.2d at 1257 (citing *Watson v. Gulf Stevedore Corp.*, 400 F.2d 649, 654 (5th Cir. 1968)); or (2) the condition has "continued for a lengthy period, and it appears to be of lasting or indefinite duration, as distinguished from one in which recovery merely awaits a normal healing period." *Watson*, 400 F.2d at 654.

The *Watson* test clarifies that "permanent" is not tantamount to "eternal" or "everlasting" and "does not foreclose the possibility that [the] condition may change." *Id.*

at 654–55.  In accordance with this rationale, a disability may be categorized as permanent even if it is not medically incurable. *Pittsburgh & Conneaut Dock Co. v. Dir., Office of Workers' Comp. Programs*, 473 F.3d 253, 259–60 (6th Cir. 2007) (upholding determination that disability was permanent under *Watson* where cognitive limitations had lasted more than a year and a half longer than typical recovery period, despite evidence of potential for improvement with psychotherapy).  Under either test, the question is whether the disability will resolve after a normal and natural healing period.  If the answer is yes, the disability is temporary. If the answer is no, the disability is permanent.

Neither the permanent nor the temporary classification is necessarily static. In *Benge*, we considered whether a disability classified as permanent could be reclassified as temporary.    Despite the "common-sense and linguistic appeal" of "[t]he notion that a 'permanent' disability is immutable," we held that "[a] disability initially deemed permanent is not immutably so." 687 F.3d at 1185–86. Thus, we reasoned, "healing related to a flare up, relapse, surgery, or other major treatment could" transform a permanent disability into a temporary one, as the "vicissitudes of the individual's responsiveness to medical treatment" lead to a "new and unknown maximum medical improvement point." *Id.* at 1186–87.  As a practical matter, the start of a new "healing period functions as a 'reset' button for a disability previously-determined to be permanent."  *Id.* at 1186.

*Benge*'s logic dictates our answer to the question of whether the prospect of future surgery rendered Carrion's disability temporary.  Absent the contingency of future surgery, Carrion's disability would unequivocally be permanent.  From the time of his injury until his hearing,

Carrion lived with constant, debilitating pain. He had no hope of normal or natural healing, only an expectation of further deterioration and the theoretical possibility of improvement through a still-distant surgery. Even the ALJ acknowledged that if Carrion "decided to forgo the surgical option and live with the knee pain indefinitely, he would be found permanently disabled."

Nevertheless, the ALJ concluded that Carrion's "condition is not one of lasting or indefinite duration because the symptoms will likely be diminished through surgery," and found that Carrion "is temporarily disabled because he is seeking surgery to improve his condition."[1] Evaluating an individual's condition based on the presumed effect of a theoretical future treatment makes scant sense—particularly in light of the "vicissitudes of the individual's responsiveness to medical treatment." *Id.* at 1186–87. For example, an anticipated surgery or course of treatment may never come to pass if an individual develops a heart condition, becomes immuno-compromised, or simply concludes that the risks of the procedure outweigh the benefits. Worse yet, a claimant might die without ever having the surgery. Alternatively, advances in medical therapies and technologies could lead to more successful medical interventions for chronic conditions, which in turn could lead to new periods of healing and "a new

---

[1] Both the ALJ and the Board cited several BRB decisions categorizing disabilities as temporary where surgery was anticipated. In these cases, however, surgery was either imminent or the claimants' disabilities had not persisted for prolonged periods without actual or expected improvement. In relying on these cases, the ALJ and the Board neglected to consider that Carrion's disability persisted for years without any expectation of "normal or natural healing." Under such circumstances, the mere prospect of eventual surgery cannot transform an otherwise undeniably permanent disability into a temporary one.

and unknown maximum medical improvement point" for the patient. *Id.* at 1186. Accordingly, the appropriate question to ask is not whether a future surgery would ameliorate Carrion's knee condition, but whether there was actual or expected improvement to his knee after a normal and natural healing period.

The impact of a future knee replacement should be assessed after the surgery, not in anticipation of such a contingency. Importantly, the Longshore Act permits modifications of disability awards to account for just such changed circumstances. *See* 33 U.S.C. § 922 ("[O]n the ground of a change in conditions . . . the deputy commissioner may . . . issue a new compensation order which may terminate, continue, reinstate, increase, or decrease" compensation, within certain time limits).

SSA additionally claims that Carrion waived his argument that his disability is permanent because he did not raise it until his post-hearing brief before the ALJ and then only as an alternative argument. This argument need not detain us long.

"The administrative waiver doctrine, commonly referred to as issue exhaustion, provides that it is inappropriate for courts reviewing agency decisions to consider arguments not raised before the administrative agency involved." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 461–62 (6th Cir. 2004) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). But, the doctrines of exhaustion and waiver "are not designed to extinguish claims which, although not comprehensively or artfully presented in the early stages of the administrative process, are presented fully before the process ends." *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979).

The question of whether Carrion was permanently disabled did not spring up on appeal.  Rather, in his post-hearing brief before the ALJ, Carrion argued that he was permanently disabled.  The ALJ devoted nearly two-and-a-half pages to this argument.   The issue was squarely presented to the BRB, which reviewed the ALJ's rejection of permanent disability.  If the agency "actually addressed [the] issue, the policies underlying the exhaustion doctrine . . . are satisfied." *W. Radio Servs., Co. v. Qwest Corp.*, 530 F.3d 1186, 1203 (9th Cir. 2008); *see also Abebe v. Gonzales*, 432 F.3d 1037, 1041 (9th Cir. 2005) (en banc) (holding that an issue is exhausted when an agency considers and decides it, even if petitioner failed to raise the issue before the agency).  Because Carrion presented his claim of permanent disability well before the conclusion of the administrative process and neither SSA nor the agency were blindsided by the argument, we conclude that the doctrines of exhaustion and waiver are inapplicable. *See Abel*,  932 F.2d at 821.

Costs on appeal shall be awarded to Respondents.

**PETITION   DENIED   AND   CROSS-PETITION GRANTED.**