United States Court of Appeals,

Fifth Circuit.

No. 93-5426.

LOUISIANA INSURANCE GUARANTY ASSOCIATION, Petitioner,

v.

Neil ABBOTT, Jr., and Director, Office of Workers' Compensation Programs, U.S. Department of Labor, Respondents.

Dec. 20, 1994.

Petition for Review of a Decision of the Benefits Review Board.

Before WHITE, Associate Justice (Ret.),[*] BARKSDALE and PARKER, Circuit Judges.

WHITE, Associate Justice (Ret.).

Appellant challenges certain portions of a decision of the United States Department of Labor Benefits Review Board (the "Board") awarding benefits to appellee under the Longshore and Harbor Workers' Compensation Act (the "Act"), 33 U.S.C. § 901 *et seq.* Specifically, appellant contends that the Board erred in affirming the findings of the administrative law judge (the "ALJ") on three points: the date of appellee's "maximum medical improvement," the availability of permanent total disability benefits during the period of appellee's vocational rehabilitation, and the calculation of appellee's post-retraining wage earning capacity. This court's review of Board decisions is limited to considering whether the Board "correctly concluded that the ALJ's order was supported by substantial evidence on the record as a

[*]The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

1

whole and is in accordance with the law." *Avondale Industries, Inc. v. Director OWCP,* 977 F.2d 186, 189 (5th Cir.1992). Because we conclude that the Board's appraisal of the ALJ's careful decision was correct on each of the points outlined above, we affirm.

## I.

On January 11, 1983, Neil Abbott, Jr., the appellee, injured his back while hanging tires, to be used as bumpers, around a vessel at the Universal Iron Works facility in Houma, Louisiana. Universal employed Abbott as a welder. Shortly after the injury, Abbott was diagnosed as having a herniated disc; he received treatment from an orthopedic specialist until April 1984, when he was released for return to work under significant restrictions. Because of the nature of his back injury, Abbott was unable to return to his previous, physically demanding job with Universal; the doctor recommended that Abbott seek vocational rehabilitation so that he could change to a more sedentary form of employment.

Following his medical release, Abbott sought vocational counseling through the Department of Labor and was referred to Jennifer Palmer, a licensed vocational rehabilitation specialist. Palmer believed that Abbott was a good candidate for vocational retraining rather than simple placement in an unskilled, minimum-wage job; she therefore designed a rehabilitation and retraining program that would allow Abbott to earn a salary equal to—if not greater than—that which he had earned as a welder with Universal. Accordingly, in the fall of 1985, Abbott began a

four-year college program in medical technology at Nicholls State University in Lafayette, Louisiana. The Department of Labor paid Abbott's tuition and required him to attend school full-time throughout the year. Abbott also was required to maintain a certain minimum grade point average. Palmer believed that school and family pressures would have precluded Abbott from working, even on a part-time basis, had the Department of Labor allowed him to do so. Abbott completed his program, plus a one-year internship, on July 25, 1990; he began working as a medical technician the following month at Southern Louisiana Medical Center, a public hospital.

From the time of the accident until September 15, 1986, Abbott received voluntary worker's compensation payments from Universal's insurer or from Universal itself. These voluntary benefits were paid—and ended—while Abbott was enrolled in the retraining program at Nicholls State. Both Universal and its insurer apparently were aware of Abbott's rehabilitation program while they made the compensation payments, and neither objected. After September 15, because of the insolvency of Universal and its insurer, Abbott sought compensation benefits under the Longshore and Harbor Workers' Compensation Act from appellant, Louisiana Insurance Guaranty Association ("LIGA"), a non-profit, unincorporated entity created by the Louisiana legislature to pay claims when the primary insurer is insolvent. See LSA-R.S. 22:1375 *et seq.*

In July 1988, an administrative law judge issued an order requiring LIGA to pay Abbott benefits for his continuing temporary

total disability.  The Board initially affirmed the ALJ's decision in all respects.  *Abbott v. Universal Iron Works, Inc.,* 23 BRBS 196 (1990).  On reconsideration, however, the Board remanded for a new hearing on Abbott's entitlement to benefits under the Act because LIGA had never been given the opportunity to contest the nature and extent of Abbott's disability.[1]  *Abbott v. Universal Iron Works, Inc.,* 24 BRBS 169 (1991).

On remand, the ALJ found that Abbott had reached maximum medical improvement on April 18, 1984, and determined that Abbott was entitled to compensation for temporary total disability[2] until he completed vocational retraining on July 25, 1990, and to permanent partial disability compensation thereafter.  LIGA appealed the ALJ's decision, and the Board affirmed in all relevant respects.  *Abbott v. Louisiana Ins. Guaranty Ass'n,* 27 BRBS 192 (1993).  We are now asked to review three aspects of the Board's decision, all of which concern the amount of benefits to which Abbott is entitled and not LIGA's liability therefor.  We discuss

---

[1]The Board denied LIGA's petition for a stay of compensation benefits while the appeal was being considered, an action that was sustained in the courts.  *In re Compensation Under Longshore & Harbor Workers' Compensation Act,* 889 F.2d 626 (5th Cir.1989), *cert. denied sub nom. Louisiana Ins. Guaranty Ass'n v. Abbott,* 494 U.S. 1082, 110 S.Ct. 1813, 108 L.Ed.2d 944 (1990).  The issues presented in that earlier appeal are not relevant here.

[2]As the Board later noted, the ALJ erred in characterizing Abbott's total disability as temporary during the period of rehabilitation, which occurred after he reached maximum medical improvement.  As we discuss *infra,* part II.A., the nature of a claimant's disability is permanent once the claimant reaches maximum medical improvement, regardless of whether the extent of that disability is total or partial.  The Board corrected the ALJ's error in terminology on appeal.

each in turn.

II.

A.

A claimant is considered permanently disabled under the Act if he or she has any residual disability after reaching maximum medical improvement, the date of which is to be determined solely by medical evidence and is not dependent on economic factors. *See Trask v. Lockheed Shipbuilding & Construction Co.,* 17 BRBS 56, 60-61 (1985). LIGA argues that the ALJ erred in concluding that Abbott did not reach maximum medical improvement until April 18, 1984, because Abbott's treating physician testified in a deposition that Abbott's physical condition had reached a "plateau" in August 1983. In finding April 18, 1984, to be the relevant date, the ALJ considered the doctor's estimation to have been a retrospective characterization. That is, the physician was saying only that, after the fact, it became clear that Abbott made no significant improvement after August 1983. The ALJ reasoned, however, that the later date represented the point of maximum medical improvement because the doctor continued to treat and evaluate Abbott between August 1983 and April 1984; it was only then that the doctor concluded that nothing further could be done for Abbott. The Board affirmed the ALJ's decision on this point; and LIGA apparently believes that the Board's holding delayed the point at which LIGA's compensation payments to Abbott could potentially be reduced for approximately eight months.

The Act provides coverage for four different categories of

5

disabilities: permanent total disability, temporary total disability, permanent partial disability, and temporary partial disability. 33 U.S.C. § 908. Thus, "[t]his statutory structure indicates two independent areas of analysis—*nature* (or duration) of disability and *degree* of disability." *Stevens v. Director, OWCP,* 909 F.2d 1256, 1259 (9th Cir.1990), *cert. denied,* 498 U.S. 1073, 111 S.Ct. 798, 112 L.Ed.2d 860 (1991). The Act does not define those terms, and hence the courts have been left to enunciate standards for distinguishing between the various categories. *New Orleans (Gulfwide) Stevedores v. Turner,* 661 F.2d 1031, 1037 (5th Cir.1981). The statutory scheme does provide, however, for different amounts of compensation based on extent and permanence of a worker's disability.

The point of maximum medical improvement represents the beginning of permanent, as opposed to temporary, disability under the statutory scheme. This court has stated that an employee is permanently disabled when "his condition has continued for a lengthy period, and it appears to be of lasting or indefinite duration, as distinguished from one in which recovery merely awaits a normal healing period." *Watson v. Gulf Stevedore Corp.,* 400 F.2d 649, 654 (5th Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755 (1969). A claimant is thus entitled to temporary disability payments until he or she has attained what courts and the Board have termed the point of maximum medical improvement. The federal courts have provided various definitions of this point, all of which amount to the same concept. *See, e.g., Palombo v.*

6

*Director, OWCP,* 937 F.2d 70, 76 (2d Cir.1991) (viewing the date of maximum medical improvement as "the point when the injury has healed to the full extent possible"); *Director, OWCP v. Berkstresser,* 921 F.2d 306, 312 (D.C.Cir.1990) (defining maximum medical improvement as "the time at which no further medical improvement is possible"); *Stevens,* 909 F.2d at 1257 (explaining that "[m]aximum medical improvement is attained when the injury has healed to the full extent possible"). Once an injury becomes permanent, an employee becomes eligible for federally-sponsored vocational rehabilitation programs, *see* 33 U.S.C. § 939(c)(2), and an employer becomes entitled to relief from compensation liability under certain conditions, *see* 33 U.S.C. § 908(f). An earlier date of maximum medical improvement is therefore likely to reduce an employer's overall compensation liability.

In this case, the Board held that a condition becomes permanent when the employee is no longer undergoing treatment with a view towards improving his condition. *See also Brown v. Lykes Bros. Steamship Co.,* 6 BRBS 244, 247 (1977) (noting that even where subsequent treatment does not improve a claimant's condition, the claimant may not reach maximum medical improvement until medical opinion establishes that the treatment was not successful and further treatment would not improve the claimant's condition). The Board's position is entirely consistent with this court's precedent. If a physician determines that further treatment should be undertaken, then a possibility of success presumably exists. One cannot say that a patient has reached the point at which no

7

further medical improvement is possible until such treatment has been completed—even if, in retrospect, it turns out not to have been effective. Here, the physician clearly believed until April 1984 that further treatment could be productive. Although LIGA contends that the doctor impermissibly took into account the fact that Abbott had not completed a vocational evaluation in the summer of 1983, the Board found that the ALJ's findings were still adequately supported when only medical, and not vocational, factors are considered. Accordingly, we hold that the Board was correct in affirming the ALJ's determination of Abbott's date of maximum medical improvement as rational and supported by substantial evidence in the record.

B.

Whereas maximum medical improvement is the indication of permanent versus temporary disability, the availability of suitable alternative employment distinguishes partial from total disability. *See Stevens,* 909 F.2d at 1259. Thus, the *degree* of a claimant's disability is not determined solely by reference to medical information. The Act defines the term "disability" as the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment." 33 U.S.C. § 902(10). Because the statute frames the definition in terms of the worker's lost wage-earning capacity, courts have generally viewed disability principally in economic terms. *Turner,* 661 F.2d at 1037-38. *See also Bumble Bee Seafoods v. Director, OWCP,* 629 F.2d 1327, 1328 (9th Cir.1980) ("The degree

of physical impairment is measured by its impact on the worker's earning capacity."). As this court has stated, "[i]t is therefore possible under [the Act] for an individual to be totally disabled "when physically capable of performing certain work but otherwise unable to secure that particular kind of work.' " *Turner,* 661 F.2d at 1038 (quoting *Diamond M. Drilling Co. v. Marshall,* 577 F.2d 1003, 1006 (5th Cir.1978)).

In this case, the ALJ awarded total disability compensation from the date of maximum medical improvement until Abbott completed his vocational rehabilitation program. LIGA's vocational expert testified that, during this entire period, Abbott had a minimum-wage residual earning capacity (i.e., he was physically capable of performing any number of available minimum-wage jobs). Thus, LIGA argues, Abbott was only partially disabled within the meaning of the Act while he was completing his job retraining program. Abbott contends, on the other hand, that it was appropriate for the ALJ to treat him as totally disabled during this time because (1) he returned to school as part of a Department of Labor-sponsored retraining program that was carefully planned and was agreed to by both his former employer and its insurance carrier, (2) even part-time work would have disqualified him from receiving the federal tuition payments that allowed him to complete the program, and (3) evidence in the record revealed that he would have been unable to maintain the required minimum grade point average while working. This case therefore cleanly presents a question of first impression in this circuit, as it was for the

Board:  may an injured worker continue to receive permanent total disability benefits while undergoing vocational rehabilitation if, but for the requirements of the retraining program, the individual would be able to take a minimum wage job?  The Board affirmed the ALJ's decision, noting that "while claimant was capable of performing jobs employer's expert identified as available, he could not realistically secure that particular employment due to his participation in his Department of Labor-approved rehabilitation plan."

As this court explained in *Turner,* once a claimant demonstrates that he is unable to perform his former longshore employment tasks because of a job-related injury, he has made a prima facie case of total disability.  The burden then shifts to the employer, should it wish to reduce or eliminate its compensation liability, to establish that the employee is capable of performing other realistically available jobs.  *Turner,* 661 F.2d at 1038;  *see also P & M Crane Co. v. Hayes,* 930 F.2d 424, 429-30 (5th Cir.1991).  The *Turner* court developed a two-pronged test by which employers can satisfy this alternate-employment burden.  Courts should consider (1) what types of jobs the claimant is capable of performing or capable of being trained to do, and (2) whether there are jobs reasonably available in the community for which the claimant is able to compete and which he could realistically and likely secure.  *Turner,* 661 F.2d at 1042.  The *Turner* court acknowledged, however, that the Act provides no standard for determining the extent of disability, *see also Roger's*

10

*Terminal & Shipping Corp. v. Director, OWCP,* 784 F.2d 687, 690 (5th Cir.1986), *cert. denied,* 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 51 (1986), and that disability under the Act is determined "not only on the basis of physical condition but also on factors such as age, education, employment history, rehabilitative potential, and the availability of work that the claimant can do." *Turner,* 661 F.2d at 1038.

The Act does not explicitly provide for the result chosen by the ALJ and approved by the Board in this case, but the decision below is consistent with this court's analysis in *Turner,* as well as with the Act's goal of promoting the rehabilitation of injured employees to enable them to resume their places, to the greatest extent possible, as productive members of the work force. *See Palombo,* 937 F.2d at 74; *Stevens,* 909 F.2d at 1260. Moreover, the Supreme Court has held that the Act should be "liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Director, OWCP v. Perini N. River Assocs.,* 459 U.S. 297, 315-16, 103 S.Ct. 634, 646, 74 L.Ed.2d 465 (1983). We conclude that the Department of Labor's restrictions on outside employment rendered the minimum wage jobs "unavailable" within the meaning of the Act and Fifth Circuit precedent. While Abbott was physically capable of performing the minimum-wage jobs LIGA's expert identified as having been available, he could not reasonably secure that employment under the statutory scheme because his participation in his rehabilitation plan approved by the Department of Labor precluded him from working.

11

Furthermore, the ALJ found, Abbott increased his earning power well above the minimum-wage level by completing his vocational retraining, thereby reducing LIGA's long-term compensation liability. LIGA now argues, after the fact, that Abbott should have been required to take a minimum-wage job instead (or, at least, that its compensation obligation should be limited as if he had taken such a job, regardless of whether he did or not). Such a result would be inconsistent with the flexible inquiry outlined in *Turner.*

The Board and the ALJ also noted that the rehabilitation program developed for Abbott in this case was consistent with the Act and the Department of Labor's regulations. The Act provides that "[t]he Secretary shall direct the vocational rehabilitation of permanently disabled employees." 33 U.S.C. § 939(c)(2). The Secretary is authorized to promulgate such rules and regulations as are necessary to administer the statute, 33 U.S.C. § 939(a), and the Department of Labor has done so regarding vocational rehabilitation, see 20 C.F.R. §§ 702.501-702.508. The regulations provide that "[t]he objective of vocational rehabilitation is the return of permanently disabled persons to gainful employment commensurate with their physical or mental impairments ... through a program of reevaluation or redirection of their abilities, or retraining in another occupation...." § 702.501. Vocational advisers are to construct training programs "in anticipation of a short, realistic, attainable vocational objective terminating in remunerable employment, and in restoring wage-earning capacity or

12

increasing it materially." § 702.506. The regulations give the advisers significant flexibility in devising such training programs: they "shall be developed to meet the varying needs of eligible beneficiaries, and may include courses at colleges...." § 702.506(b).

In retrospect, it may be that Abbott's vocational counselor could have devised a shorter rehabilitation program for Abbott. We agree, however, that the program chosen was reasonable, and that, contrary to LIGA's assertion, that plan was not blindly or rigidly adhered to by either the counselor or the administrative review panels below. In light of the limited standard of review, the Board's decision must be affirmed. It would be "unduly "harsh and incongruous' to find that suitable alternative employment was reasonably available if the claimant demonstrates that, through his own diligent efforts" at rehabilitation, he was ineligible for such a job. *Palombo,* 937 F.2d at 73 (affording claimant an opportunity to prevail by showing he diligently sought but was unable to secure a job because that result is consistent with the remedial goals of the Act). The Act gives the Department of Labor the authority to direct rehabilitation programs; courts should not frustrate those efforts when they are reasonable and result in lower total compensation liability for the employer and its insurers in the long run.

### C.

Finally, LIGA asserts that the ALJ erred in calculating Abbott's post-retraining residual wage-earning capacity (from the

13

time he completed his rehabilitation program and began working as a medical technician at the Southern Louisiana Medical Center). The ALJ determined that Abbott was entitled to permanent partial disability compensation commencing in July 1990 and measured as the difference between his average weekly earnings as a welder at the time of his accident in January 1983 and the wages available to a medical technician in the area at that time. In calculating the latter figure, the judge relied upon an average between the wage earned by such technicians in private and public hospitals in Abbott's area, and the Board approved that calculation. LIGA contends that the ALJ should have used the higher, private-industry figure because the evidence suggests that Abbott could have obtained a private sector job as a medical technician at Terrebonne General Hospital or Lakewood Hospital.

The parties agree that Abbott was entitled to permanent partial disability benefits after he completed the vocational rehabilitation program and began work as a medical technician. The statute provides that "the compensation shall be 662/3 per centum of the difference between the average weekly wages of the employee [before the accident] and the employee's wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of partial disability." 33 U.S.C. § 908(c)(21). The wage-earning capacity of an injured employee in cases of partial disability, in turn, "shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: *Provided, however,* that if the employee['s]

14

... actual earnings do not fairly and reasonably represent his wage-earning capacity, the [ALJ] may, in the interest of justice, fix such wage-earning capacity as shall be reasonable...." § 908(h). The statute thus permits the factfinder significant discretion in fashioning a reasonable post-injury wage-earning capacity for the injured worker. *See, e.g., Penrod Drilling Co. v. Johnson,* 905 F.2d 84, 87 (5th Cir.1990) (describing method of calculating award for permanent partial disability); *Randall v. Comfort Control, Inc.,* 725 F.2d 791, 795 (D.C.Cir.1984).

Here, the ALJ calculated Abbott's wage-earning capacity by averaging the wages a medical technician would have earned at the area's higher-paying private hospital with those of the lower-paying, publicly-funded hospital where Abbott was actually employed. The ALJ therefore recognized that Abbott's actual income did not fairly represent his wage-earning capacity for the period after his vocational retraining; the judge then attempted to calculate the relevant wage in the market as a whole. The record shows that Abbott applied for a job at Terrebonne Hospital upon completion of his medical technician degree but was not accepted. Later, Abbott was contacted twice by Terrebonne with regard to employment, but he declined to pursue the opportunities, noting that he was content with his job at the public hospital because of its proximity to his house and because he was not required to work on weekends. Taking these facts into account, the ALJ determined that averaging the two salary figures would provide a fair and appropriate measure of what a trained medical technician would have

15

earned in 1983.

The Board concluded on appeal that the ALJ's determination was supported by substantial evidence, and our review of the record reveals no reason to disagree.  The ALJ's compensation order fixed a residual wage-earning capacity that is clearly reasonable within the meaning of the Act, and it compensates Abbott appropriately for his permanent partial disability.

III.

Because it correctly concluded that the ALJ's compensation order was supported by substantial evidence on the record as a whole, and that it was in accordance with the law, the decision of the Benefits Review Board is

*Affirmed.*