# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
November 25, 2019

Lyle W. Cayce
Clerk

No. 18-60662

INTERNATIONAL-MATEX TANK TERMINALS; ZURICH AMERICAN INSURANCE COMPANY,

Petitioners

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; DWAYNE D. VICTORIAN,

Respondents

Petition for Review of an Order of the
Benefits Review Board

Before KING, HIGGINSON, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Respondent Dwayne Victorian was an assistant shift foreman at an oil-and-gas storage facility ("Facility"[1]) on the Mississippi River owned by Petitioner International-Matex Tank Terminals ("IMTT").[2] While at work, Victorian was injured and disabled. Victorian filed a claim with the Department of Labor under the Longshore and Harbor Workers' Compensation Act ("Act"), 33 U.S.C. § 901 *et seq.*, which, under certain circumstances,

---

[1] In its own literature, IMTT calls the Facility a "marine terminal." We avoid that term because the parties dispute whether the Facility is a "terminal" for purposes of the legal issues presented in this appeal.

[2] IMTT's insurer, Zurich American Insurance Company, is also a petitioner.

No. 18-60662

compels employers to compensate employees who become temporarily disabled while on the job. The administrative law judge ("ALJ") found that Victorian fulfilled the Act's requirements, in part because: (1) Victorian's injury occurred at a marine "terminal," one of the enumerated areas covered by the Act; (2) at the time of his injury, Victorian was engaged in maritime employment; (3) Victorian had not reached "maximum medical improvement" when he filed his claim; and (4) Victorian had made adequate efforts to locate alternative employment. The Benefits Review Board ("Board") affirmed the ALJ's findings. We will deny IMTT's petition for review.

## I.

## A.

The Facility, one of ten owned by IMTT, lies on the west bank of the Mississippi River in Gretna, Louisiana. It exists primarily to store oil products: its sixty storage tanks have a combined capacity of 2.3 million barrels. The Facility's operations are centered on the Mississippi River. Although the Facility is accessible by railroad and commercial truck, all the product stored at the Facility departs it by ship, and most arrives by ship, too. The Facility's dock can accommodate four barges at once and is used by barges every day.

Facility employees occasionally heat oil to make it easier to pump. They also sometimes engage in "sparging," a process by which fuel is created from diesel and oil. The resultant fuel is consumed by ships that dock at the Facility.

## B.

At the time of his injury, Victorian was an assistant shift foreman. Typically, during a vessel's loading or unloading, the assistant foreman monitors the rate at which product flows from ship to tank or vice versa in order to ensure the correct amount is transferred. Sometimes, this can be done from an office and does not require the assistant foreman to be in the yard. But

No. 18-60662

increased workload, crew absences, and other circumstances often require the assistant foreman to work in the yard. For instance, the assistant foreman must sometimes act as a "pumper," checking pipes and manifolds in the yard to ensure product flows correctly. He must also help "blow out" [3] the pipes that connect tanks to each other and to vessels.

Victorian participated in all these tasks, assisting in loading and unloading product from vessels daily. Even when working from the office, he went to the yard and the dock every day and occasionally had to board vessels.

C.

Like all other team members, Victorian also assisted with tank-to-tank transfers. On June 25, 2014, Victorian assisted with a transfer from Tank 123 to Tank 107. During the transfer, Victorian was pulling an air hose up a staircase to reach an elevated platform near Tank 107, in order to blow out a pipeline. He prepared to throw the hose "to get [it] nearer" the pipeline he was blowing out. The hose "apparently became hooked on the bottom step," such that when Victorian attempted to throw it, the hose "jerked him back in the opposite direction from where he was throwing the hose." Victorian "immediately felt pain in his 'neck and upper extremity'" but finished his shift.

D.

The next day, Victorian visited Elmwood Industrial Medical Center in Metairie, Louisiana, complaining of pain in his left shoulder, scapula, and lower neck. Over the following weeks, Victorian returned several times to Elmwood, complaining of more pain. He was diagnosed with cervical radiculopathy, and on July 29, 2014, his physician noted he had "no work capacity."

---

[3] "Blowing out" is a process by which air is pumped through a pipeline to force oil products out of it.

No. 18-60662

On September 8, 2014, Victorian was referred to a neurosurgeon, Lucien Miranne. Dr. Miranne diagnosed Victorian with disc herniation and recommended an electromyogram and medication. Based on the effectiveness of the electromyogram, Dr. Miranne "deferred any surgical consideration" and recommended nonsurgical treatment instead. At IMTT's behest, Dr. Karen J. Ortenberg examined Victorian on December 15, 2015, and opined that he was a good candidate for cervical fusion. She also opined that if Victorian did not want to pursue surgery, he had reached maximum medical improvement ("MMI").[4]

On August 12, 2016, after months of fruitless nonsurgical treatment, Dr. Miranne recommended Victorian undergo a cervical discectomy and fusion. Victorian told Dr. Miranne he intended to undergo the surgery. Victorian's brief states that he has undergone the procedure and is now recovering.

E.

Stacie A. Nunez, an IMTT rehabilitation counselor, submitted a vocational rehabilitation report for Victorian on February 29, 2016. Nunez reviewed Victorian's medical records and work history and developed a list of jobs near Victorian's residence that would be compatible with his medical condition, education, and experience. With the help of his wife, Victorian applied to many jobs, both online and in person, but he received no offers.

F.

Victorian made a claim for benefits under the Act against IMTT, which IMTT contested. In a lengthy and detailed order, the ALJ concluded that

---

[4] After an employee reaches MMI, his injury is deemed "permanent," and he may become eligible for federal vocational rehabilitation. *La. Ins. Guar. Ass'n v. Abbott*, 40 F.3d 122, 126 (5th Cir. 1994) (citations omitted). At that point, the otherwise-liable employer can stop compensating him for his disability. *Id.* It would thus reduce IMTT's liability for Victorian to have already reached MMI.

Victorian stated a valid claim under the Act and rejected IMTT's objections. The ALJ also found that Victorian had not yet reached MMI and was temporarily totally disabled. The ALJ ordered IMTT to pay Victorian compensation for temporary total disability starting from July 30, 2014.

IMTT appealed to the Board, arguing among other things that: (1) Victorian's injury did not occur on an Act-covered "situs," *see* 33 U.S.C. § 903(a); (2) at the time of his injury, Victorian was not "engaged in maritime employment," *id.* § 902(3); (3) the ALJ's finding that Victorian had not reached MMI was not supported by substantial evidence; and (4) the ALJ's finding that Victorian had adequately sought alternate employment was not supported by substantial evidence.

The Board rejected these arguments (and others not before us) and affirmed the ALJ's order. As relevant here, the Board held that the Facility is a "terminal" within the Act's ambit and that Victorian's "job duties as an assistant shift foreman" rendered him a maritime employee. The Board affirmed the ALJ's factual findings that Victorian had not met MMI and that he had exercised due diligence in seeking alternate employment.

IMTT timely petitioned for review. The Director of the Office of Worker's Compensation Programs joins Victorian in defending the Board's decision. *See Wood Grp. Prod. Servs. v. Malta*, 930 F.3d 733, 736 n.4 (5th Cir. 2019) ("The Director is a party to the litigation of disputed claims under the Act at all stages of the litigation." (citation omitted)). We have jurisdiction under 33 U.S.C. § 921(c).

No. 18-60662

II.

Where the facts are not in dispute, we review *de novo* the Board's legal conclusion that a worker is covered under the Act. *Wood Grp.*, 930 F.3d at 736–37 (citing *New Orleans Depot Servs., Inc. v. Zepeda*, 718 F.3d 384, 387 (5th Cir. 2013) (en banc)). We must also ensure the Board's decision treated as "conclusive" the ALJ's findings of fact, so long as they were "supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3); *see also Port Cooper/T. Smith Stevedoring Co. v. Hunter*, 227 F.3d 285, 287 (5th Cir. 2000) (same). In reviewing the ALJ's fact findings, neither the Board nor this panel may "substitute [its] judgment for that of the ALJ" or "reweigh or reappraise the evidence." *Hunter*, 227 F.3d at 287 (cleaned up).

III.

"[T]he Act 'provides compensation for the death or disability of any person engaged in maritime employment,' under certain conditions." *Wood Grp.*, 930 F.3d at 736 (cleaned up) (quoting *Herb's Welding v. Gray*, 470 U.S. 414, 415 (1985)). In its petition, IMTT contends the Board erred in affirming the ALJ's decisions that (1) Victorian's injury occurred on a maritime situs; (2) Victorian was engaged in maritime employment; (3) Victorian had not reached MMI; and (4) Victorian adequately sought alternative employment. We address each argument in turn.

A.

The Act applies only to claimants injured "on a maritime situs." *Coastal Prod. Servs., Inc. v. Hudson*, 555 F.3d 426, 431 (5th Cir. 2009). This means that a claimant's injury must have

> occurr[ed] upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

6

No. 18-60662

33 U.S.C. § 903(a). Our cases have conceptualized the situs requirement as having two components: geographic and functional. *Wood Grp.*, 930 F.3d at 737 (citations omitted).

To satisfy the geographic component—*i.e.*, that the area of injury be "adjoining" navigable waters—the area must "border on" or "be contiguous with" navigable waters. *Zepeda*, 718 F.3d at 393–94. To satisfy the functional component, our precedent requires a more complicated analysis. If the area of injury is putatively one enumerated under § 903(a)—a "pier, wharf, dry dock, terminal, building way, [or] marine railway"—then we ask whether that area has "some maritime purpose." *Thibodeaux v. Grasso Production Management, Inc.*, 370 F.3d 486, 493 (5th Cir. 2004); *see also Wood Grp.*, 930 F.3d at 738–40 (discussing *Thibodeaux*). If, on the other hand, the area is not one of the enumerated places but instead an "other adjoining area," we ask whether that area is "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a); *see also Zepeda*, 718 F.3d at 389; *Wood Grp.*, 930 F.3d at 739–40.

We agree with the Board's conclusion—and with its affirmance of the ALJ's findings—that Victorian fulfills the Act's situs requirement because the Facility (1) adjoins navigable waters (meeting the geographic component) and (2) qualifies as a "terminal" under § 903(a) and serves the maritime purpose of loading and unloading vessels (meeting the functional component).[5]

1.

We first consider the determination that the Facility adjoins navigable waters and therefore satisfies the geographic component of the situs test.

The ALJ correctly relied on our holding in *Zepeda* that to satisfy this

---

[5] The ALJ held alternatively that the Facility is an "other adjoining area customarily used by an employer in loading [and] unloading . . . a vessel." Like the Board, we conclude the Facility is a "terminal" and therefore will not review the ALJ's alternative holding.

component, the putative situs must "border on" or "be contiguous with navigable waters." *See Zepeda*, 718 F.3d at 392. The ALJ found that the Facility, "although large in size, is situated along the navigable waters of the Mississippi River." It also found that the Facility's activities center on its dock and that it is a "discrete shoreside facility." The Board affirmed, holding that the Facility was a "contiguous" area that "adjoin[ed] the water."

We find no error in these determinations. Both the Board and the ALJ inquired, as our precedent requires, whether the Facility borders on or is contiguous with navigable waters. *See id.* As the Board properly concluded, the ALJ's finding that the Facility borders the Mississippi River is supported by substantial evidence, including aerial photographs of the Facility and ample testimony regarding its dock and physical connections to the river.

IMTT does not dispute that the Facility as a whole adjoins the river but argues that the particular platform on which Victorian was injured is too far from the river to fulfill the geographic component. We disagree. "It is the parcel of land underlying the employer's facility that must adjoin navigable waters, not the particular part of that parcel upon which a claimant is injured." *Zepeda*, 718 F.3d at 392; *cf. BPU*, 732 F.3d at 461 (focusing on "the general purpose of the area rather than requiring 'every square inch of an area' to be used for a maritime activity" (quoting *Hudson*, 555 F.3d at 435)). The only case on which IMTT relies to support this argument, *Zepeda*, does not help its position, as no part of the facility at issue there adjoined navigable waters. *See* 718 F.3d at 394 ("[T]here is no dispute that the Chef Yard . . . did not adjoin navigable waters.").

### 2.

We next consider the determination that the Facility satisfies the functional component of the situs requirement because the Facility is a

No. 18-60662

"terminal" under § 903(a) that had "some maritime purpose."

a.

The Act does not define "terminal," and, as the ALJ correctly noted, neither have we. For guidance, the ALJ looked to an OSHA regulation, Webster's Dictionary, and a definition invoked by the Supreme Court.

The pertinent OSHA regulation defines a "marine terminal" as

> wharves, bulkheads, quays, piers, docks and other berthing locations and adjacent storage or adjacent areas and structures associated with the primary movement of cargo or materials from vessel to shore or shore to vessel including structures which are devoted to receiving, handling, holding, consolidating and loading or delivery of waterborne shipments or passengers.

29 C.F.R. § 1917.2. The regulation further explains that "[t]he term does not include production or manufacturing areas nor does the term include storage facilities directly associated with those production or manufacturing areas." *Id.* The dictionary the ALJ cited defines "terminal" as "'[o]f, relating to, situated at, or forming an end or boundary,' 'relating to or occurring at the end of a section or series,' 'either end of a transportation line, as a railroad.'" *See* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1194 (1988). Finally, the ALJ also relied on a state commission's definition of "marine terminal" which the Supreme Court cited as "useful":

> an area which includes piers, which is used primarily for the moving, warehousing, distributing or packing of waterborne freight or freight to or from such piers, and which, inclusive of such piers, is under common ownership or control.

*Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 268 n.30 (1977) (citation omitted).

Applying these definitions, the ALJ concluded that the Facility is a "terminal" under the Act. The ALJ relied on testimony that all the product stored at the Facility departs it by ship and that most arrives by ship, too. The

9

No. 18-60662

ALJ also cited testimony that the Facility's dock is used by barges every day and that several barges dock there. The ALJ further considered that IMTT itself refers to the Facility as a "terminal." The Board affirmed. Specifically, the Board held that the definitions relied on by the ALJ "describe[d] both the physical attributes of the area and the maritime purpose of the docks, pipelines and storage tanks at employer's Gretna facility, which is to move waterborne shipments from vessel to shore and product from shore to vessel."

We find no error in this analysis. Like the Board, we conclude that the definitions of "marine terminal" on which the ALJ relied are pertinent. The Act employs the undefined word "terminal" as a "maritime term of art," and therefore we must give the term its "established" meaning in the maritime industry. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). The definition relied on in *Caputo* was, as the Supreme Court explained, a "useful indicator[] of the terminology used by the industry." 432 U.S. at 268 n.30. Similarly, the OSHA definition—found in Part 1917 of the Department of Labor regulations concerning "marine terminals"—provides relevant evidence of established industry usage of the term. *See generally* 29 C.F.R. § 1917.1(a) (providing "[t]he regulations of this part apply to employment within a marine terminal as defined in § 1917.2"). Of particular relevance here, the definition "includ[es] structures which are devoted to receiving, handling, *holding*, *consolidating* and loading or delivery of waterborne shipments." *Id.* § 1917.2 (emphases added); *accord Caputo*, 432 U.S. at 268 n.30 (a terminal is an area "used primarily for the moving, *warehousing*, distributing or *packing* of waterborne freight" (emphases added)).[6]

---

[6] We find less helpful Webster's generic definition of "terminal," given that "terminal" as used in the Act is a maritime term of art.

Moreover, as the Board concluded, substantial evidence supported the ALJ's finding that the Facility falls comfortably within these definitions of "terminal." In particular, the ALJ relied on undisputed testimony that the Facility "receives" oil products, "consolidates and/or mixes product, stores product, and transports or loads product out of the facility." The ALJ also relied on undisputed testimony that the Facility has a number of "adjacent" structures that are "devoted to receiving, handling, holding, consolidating and loading or delivery of waterborne shipments." In addition, while IMTT's label for the Facility—a "marine terminal"—is not dispositive, the ALJ reasonably found that it provides some evidence that the Facility meets the industry definition of a "terminal."

For its part, IMTT offers no alternative definition of "terminal." Instead, it argues that in defining the term, the ALJ should not have relied on a dictionary definition or an OSHA regulation but should instead have taken the "functional approach" mandated by our decision in *Thibodeaux*. IMTT misreads our precedent. Our "functional approach" does not inform the inquiry whether a particular locale falls within one of § 903(a)'s enumerated terms. Instead, it asks the subsequent and distinct question whether a particular locale has a "maritime purpose." *See Thibodeaux*, 370 F.3d at 488–89 ("functional approach" requires that putative situs also "serve a maritime purpose" (citations omitted)).

IMTT also attacks head-on the conclusion that the Facility meets the definition of a "terminal." In IMTT's view, the Facility should instead be characterized as either a "storage" facility, or perhaps—pointing to its heating and sparging processes—a "manufacturing" facility. Emphasizing these aspects of the Facility, IMTT argues that the Facility "is not just the end of a transportation line for vessels" and therefore not a "terminal." This argument,

however, ignores the OSHA and *Caputo* definitions, which include not only structures used for loading and unloading vessels but also those used for "receiving, handling, holding, consolidating," and "warehousing" products. *See* 29 C.F.R. § 1917.2; *Caputo*, 432 U.S. at 268 n.30. Indeed, only lines later in its brief, IMTT admits that the Facility is "engaged in loading, unloading, [and] storage." Similarly, the Facility's heating and sparging procedures do not convert it into a "manufacturing facility," as IMTT contends. If anything, these procedures reinforce its characterization as a shipping terminal: the fuel it blends is used to power the vessels that dock at the Facility, and the Facility heats oil in part to make it easier to load and unload from vessels.[7]

Finally, IMTT argues that because the Facility is "mixed-use," the Board should have analyzed it as an "other adjoining area" instead of a "terminal." But IMTT cites no cases suggesting a "mixed-use" facility cannot be a "terminal" but can constitute only an "other adjoining area." And, as discussed above, the OSHA and *Caputo* definitions make clear that the term "marine terminal" can encompass facilities with several functions.

b.

We also agree with the Board that the ALJ's finding that the Facility has "some maritime purpose" was supported by substantial evidence.

The Board identified the relevant legal standard, namely that an enumerated situs is marked not only by its physical characteristics but also by its "maritime purpose." *Thibodeaux*, 370 F.3d at 488–89. As already explained,

---

[7] For similar reasons, we reject IMTT's argument that the Facility's non-shipping structures—like its "guard shack," "office building," and "product testing facilities"— somehow strip the Facility of its terminal status. This argument again ignores the OSHA and *Caputo* definitions, both of which show that a "marine terminal" encompasses facilities that do more than simply load and unload cargo. *See* 29 C.F.R. § 1917.2 (term includes structures devoted to "handling, holding, [and] consolidating" cargo); *Caputo*, 432 U.S. at 268 n.30 (term includes structures used for "warehousing, distributing or packing" cargo).

this is the "functional approach" to the situs inquiry. *Id.* The Board also correctly noted that not "every square inch of an area" must be used for maritime activity. *Hudson*, 555 F.3d at 435.

We affirm the Board's holding that substantial evidence supported the ALJ's finding that the Facility has "some maritime purpose." *See Thibodeaux*, 370 F.3d at 488–89. The Board pointed to the "[s]ubstantial evidence of record" supporting "the finding that the Gretna facility ships and receives the overwhelming majority of its liquid bulk product from vessels at a dock on its property, and has 60 storage tanks for the liquid bulk product that is unloaded directly from ship to tanks and stored there." This finding rests on the unrefuted testimony of multiple IMTT employees. Moreover, as we have recently reaffirmed, the "maritime purpose" test is fulfilled by evidence that the putative situs is used for loading or unloading vessels. *See Expeditors & Prod. Serv. Co., Inc. v. Spain*, No. 18-60895, Slip Op. at 3 (5th Cir. Nov. 4, 2019), *as revised* Nov. 5, 2019 (citing *Thibodeaux*, 370 F.3d at 488–89).

The Board also correctly rejected IMTT's "misguided" argument that because some "manufacturing"—blending and sparging[8]—occurred at Gretna Terminal, it lacked maritime purpose. The Board correctly noted that not "every square inch of an area" must be used for maritime activity. *Hudson*, 555 F.3d at 435. Based on substantial evidence, the ALJ found that no tanks are dedicated solely to these processes and that all sixty of the Facility's tanks are customarily used to load and unload vessels. As we have held more than once before, a covered situs "need not be used exclusively or even primarily for maritime purposes, as long as it is customarily used for significant maritime activity." *Hudson*, 555 F.3d at 432; *see also BPU*, 732 F.3d at 461 ("[T]he site

---

[8] We assume only for the sake of argument that "blending and sparging" are properly considered "manufacturing" processes.

of the injury need not be 'exclusively' or 'predominantly' used for unloading—only customarily." (citation omitted)).

## B.

We turn next to the Board's conclusion that Victorian fulfills the Act's status requirement. As explained above, the status requirement means that Victorian must have been "engaged in maritime employment" at the time of his injury. 33 U.S.C. § 902(3).

The ALJ found that Victorian's "employment as a whole was an integral part of the loading and unloading operations at the Gretna terminal." The ALJ supported this conclusion by reasoning that Victorian's

> activities of opening and closing valves which directed the flow of product into specific tanks, monitoring and lighting-up the pipelines, reading the gauges on tanks, and communicating with the dockmen to assist in the smooth transfer of product from the moored vessels into the tanks, were all integral parts of the loading and unloading process at the terminal and were one step in the direct chain of unloading or loading vessels.

The ALJ concluded that "[u]ndoubtedly, none of the product would be loaded or unloaded on vessels without [Victorian] performing his duties in the tank yard." The Board affirmed the ALJ, concluding substantial evidence showed that Victorian's "job duties were integral to the loading and unloading process" and that Victorian therefore satisfied the status requirement.

We find no error in the Board's analysis. The Board correctly noted that a worker is "engaged in maritime employment" under § 902(3) if he is loading or unloading a vessel at the time of injury or if his employment as a whole entails loading or unloading vessels. *Hudson*, 555 F.3d at 439. To meet the latter criterion, the worker need not spend a "substantial" amount of time loading or unloading. *Boudloche v. Howard Trucking Co.*, 632 F.2d 1346, 1347 (5th Cir. 1980); *see also id.* (worker covered despite spending only 2.5 to 5

percent of his time loading and unloading); *Hudson*, 555 F.3d at 440 (worker covered despite spending only 10 percent of his time in maritime activities). Instead, as the Board wrote, the worker need only spend "some" time doing maritime work. *Caputo*, 432 U.S. at 273.

The Board also correctly concluded that substantial evidence supported the ALJ's findings on Victorian's maritime status. Victorian was tasked with monitoring and effecting the flow of oil products, opening and closing manifolds to direct flow, and communicating with other team members to ensure vessels were loaded and unloaded properly. He visited the dock and assisted with loading and unloading every day. IMTT fails to explain why this does not constitute substantial evidence supporting the ALJ's maritime status finding.

Finally, to support its position that Victorian lacks maritime status, IMTT leans heavily on Judge Clement's concurrence in *Zepeda*, 718 F.3d at 394 (Clement, J., concurring). Even if that concurrence were circuit law (it is not), that would not help IMTT. To determine maritime status, Judge Clement's *Zepeda* concurrence asked whether the employee engages in "the type of customary maritime work that a dockworker or longshoreman would have to perform in order to successfully transfer cargo between ship and land transportation." *Id.* Contrary to IMTT's argument, however, the ALJ found that Victorian's "employment as a whole[] was an integral part of the loading and unloading operations at the Gretna terminal."

In sum, we affirm the Board's determination that Victorian had maritime status under the Act.

C.

We next consider the Board's affirmance of the ALJ's finding that Victorian had not reached MMI, which IMTT argues was not supported by substantial evidence.

No. 18-60662

As the Board correctly observed, MMI "is reached when an injury has received the maximum benefit of treatment such that the patient's condition will not improve." *Gulf Best Elec., Inc. v. Methe*, 396 F.3d 601, 605 (5th Cir. 2004). But "[i]f a physician determines that further treatment should be undertaken, then . . . further medical improvement is possible until such treatment has been completed—even if, in retrospect, it turns out not to have been effective." *La. Ins. Guar. Ass'n v. Abbott*, 40 F.3d 122, 126 (5th Cir. 1994). The Board was obligated to defer to the ALJ's finding unless it was not supported by substantial evidence. *Hunter*, 227 F.3d at 287.

We agree with the Board that the ALJ's finding was supported by substantial evidence. The ALJ scoured Victorian's medical records with extraordinary care. The record shows that although Dr. Miranne initially recommended nonsurgical treatment for Victorian's back, it eventually became clear that Victorian's physical rehabilitation was ineffective and that surgery would have made "further medical improvement . . . possible." *Abbott*, 40 F.3d 126. Both Drs. Miranne and Ortenberg recommended the surgery, evidence that they had "determine[d] that further treatment should be undertaken." *Id.* The record also reflects that on August 12, 2016, Victorian told Dr. Miranne he intended to undergo the surgery.

IMTT contends that Victorian achieved MMI on December 15, 2015, when Dr. Ortenberg opined that if Victorian chose not to pursue surgery, then he had achieved MMI. IMTT points to record evidence suggesting that Victorian did not pursue surgery immediately after it was recommended to him by Dr. Ortenberg, choosing instead a more conservative course of treatment. IMTT further argues that the "mere expression of a desire to undergo surgery does not automatically render a claimant temporarily and totally disabled." IMTT contends that because Victorian would have achieved MMI and could

have returned to some form of work if he chose not to pursue the recommended surgery, the Board's reading of the Act "would allow a claimant to live in a [perpetual] state of temporary disability" and that "it is the actual surgical procedure and subsequent recovery itself that would render a claimant temporarily disabled"

IMTT's argument is unconvincing. There may be a point after which a claimant's unreasonable delay in electing further treatment leads to de facto MMI. The Director suggests as much, and the Act allows the ALJ or the Secretary of Labor to suspend payment if a claimant "unreasonably refuses to submit to medical or surgical treatment . . . unless the circumstances justified the refusal." *Methe*, 396 F.3d at 604 (quoting 33 U.S.C. § 907(d)(4)). But IMTT has not articulated where that point may be, identified any evidence that Victorian's delay was unreasonable, or supplied legal authority that Victorian bears the burden of proving his delay was reasonable.

Instead, IMTT seems to suggest that to avoid slipping into MMI, Victorian had an affirmative duty immediately to undergo every kind of treatment available. Again, IMTT cites no authority for this proposition, which is contrary to our precedent. *See Methe* 396 F.3d at 605 (MMI reached only when "an injury has received the maximum benefit of treatment such that the patient's condition will not improve."); *Abbott*, 40 F.3d at 126 (MMI not reached "[i]f a physician determines that further treatment should be undertaken").

## D.

Finally, we turn to the Board's affirmance of the ALJ's finding that Victorian reasonably sought alternative employment.

Victorian claims "temporary total" disability, one of the types of disability for which the Act mandates varying compensation levels. *See*

*generally* 33 U.S.C. § 908.[9] To establish temporary total disability, a claimant must "demonstrate" that his injury has rendered him "unable to perform his former longshore employment tasks." *Abbott*, 40 F.3d at 127. The employer can respond by "establish[ing] that the employee is capable of performing other realistically available jobs." *Id.* If the employer succeeds on that showing, the claimant's disability remains total (rather than becoming "partial") only if he "demonstrates that he diligently tried and was unable to secure such employment." *Roger's Terminal*, 784 F.2d at 691.

Here, it is undisputed that Victorian established a prima facie case and that IMTT responded adequately by providing Victorian a list of suitable alternative jobs. IMTT does not contest that Victorian applied for those jobs but claims he was not diligent in trying to secure alternative employment. We disagree.

The ALJ identified a trove of evidence demonstrating Victorian's efforts to find alternative employment. This includes a "job application log" Victorian created, detailing several applications he had submitted. The ALJ also identified testimony from both Victorian and his wife that Victorian applied for several other positions online. Victorian's wife testified further that she and her daughter had on separate occasions driven Victorian to workplaces to apply for other jobs.

IMTT responds that the ALJ disregarded testimony from Stacie Nunez that some employers listed in the labor market survey she conducted had not

---

[9] Among these types are "total permanent, permanent partial, temporary total, and temporary partial disabilities." *Roger's Terminal & Shipping Corp. v. Smith*, 784 F.2d 687, 690 (5th Cir. 1986). The Act does not define these terms. *New Orleans (Gulfwide) Stevedores v. Turner*, 661 F.2d 1031, 1037 (5th Cir. 1981). But "[i]t is settled law that the degree of disability is determined not only on the basis of physical condition but also on factors such as age, education, employment history, rehabilitative potential, and the availability of work that the claimant can do." *Smith*, 784 F.2d at 691 (cleaned up).

No. 18-60662

received applications from Victorian. Elsewhere, IMTT claims that the ALJ was wrong to find Victorian credible because while he had testified that a particular employer did not respond to his application, he had in fact "received a letter" from the employer "informing him that he was no longer being considered for the position." These arguments do little to offset the substantial evidence on which the ALJ relied. The ALJ acknowledged Nunez's testimony and analyzed it at length. Even assuming Victorian conflated one employer's rejection with another's non-response, it would hardly be grounds to impeach the rest of his testimony. And even if we found merit in these arguments, to accept them now would be to inappropriately "reweigh" and "reappraise the evidence." *Hunter*, 227 F.3d at 287 (cleaned up).

\* \* \*

The petition for review is DENIED.